UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re:

KEEN EQUITIES, LLC,

                                      Debtor.

-----------------------------------------------------------x

Hearing Date and Time:
August 6, 2014 at 3:00 p.m.

Chapter 11

Case No. 13-46782 (NHL)

## NOTICE OF HEARING ON THE DEBTOR'S MOTION TO APPROVE FUNDING ARRANGMENTS AMONG INVESTORS TO FINANCE POST-PETITION OPERATIONS

PLEASE TAKE NOTICE that upon the attached motion of Keen Equities, LLC, the undersigned will move before the Honorable Nancy H. Lord, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of New York, Courtroom 2529, located at 271-C Cadman Plaza East, Brooklyn, NY 11201 on August 6, 2014 at 3:00 p.m. for an Order pursuant to 11 U.S.C. § 364 approving funding arrangements among investors to finance the Debtor's post-petition operations.

PLEASE TAKE FURTHER NOTICE THAT objections, if any, to the relief requested, shall be filed in writing through the Clerk's ECF system, with a copy delivered to the Chambers of Judge Lord, and served upon the Debtor's counsel, Kevin J. Nash, Esq., Goldberg Weprin Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, NY 10036, so as to be received no later than seven (7) days before the said hearing date.

Dated: New York, New York
          July 11, 2014

                              GOLDBERG WEPRIN FINKEL
                              GOLDSTEIN LLP
                              *Attorneys for the Debtor*
                              1501 Broadway – 22nd Floor
                              New York, New York 10036
                              (212) 221-5700

By:    _____
              Kevin J. Nash, Esq.
              A Member of the Firm

TO:  All Creditors and Equity Holders

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                          Chapter 11

KEEN EQUITIES, LLC,                             Case No. 13-46782 (NHL)

                            Debtor.
------------------------------------------------------------x

## DEBTOR'S MOTION TO APPROVE FUNDING ARRANGEMENTS AMONG INVESTORS TO FINANCE POST-PETITION OPERATIONS

         The Application of Keen Equities, LLC (the "Debtor"), by its counsel, Goldberg Weprin Finkel Goldstein LLP, in support of its motion to approve funding arrangements among investors to finance post-petition operations, respectfully represents as follows:

### Background

         1.     The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on November 12, 2013, and thereafter has continued in possession and management of its property as a debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108.

         2.     The Debtor is the owner of approximately 860 acres of largely vacant land (the "Lake Anne Property"), situated close to the Hassidic community of Kiryas Joel, in Monroe, New York. The Lake Anne Property was purchased in 2006 with the goal of building residential homes to meet the growing needs of the Kiryas Joel community (the "Project").

         3.     The Lake Anne Property is currently subject to a purchase money mortgage in the current principal balance of $3,924,645.23 plus accrued interest and other charges (the "Mortgage"). The Mortgage was assigned to the Hal J. Greene Living Trust, David A. Greene and Trust U/W M. Green f/b/o Sabrina Greene (collectively, the "Greene Family") after the Debtor's acquisition of the site.

4.      The Debtor is comprised of a New York limited liability company, consisting of twelve members/investors (both corporate and individual). The identities of the members (together with their corresponding percentages) were disclosed as part of the Chapter 11 petition and are listed with all current adjustments on the schedule annexed hereto as <u>Exhibit</u> "A." Also attached as <u>Exhibit</u> "B" is a copy of the Debtor's operating agreement.

5.      The Debtor filed the Chapter 11 petition with the goal of attempting to work more constructively with local village officials in South Blooming Grove to obtain approvals for the Project. To this end, the Debtor has submitted applications with the Bankruptcy Court to retain a real estate development consultant (Simon Gelb of CPC) and special real estate counsel (Steven Barshov, Esq.) to assist in overseeing the Project and formulating a suitable development plan.

6.      The Debtor has already participated in a formal meeting before the Community Design Review Committee (CDRC) which encouraged the Debtor to prepare and file a subdivision application and a site plan application (the "Applications"). The Debtor is busily preparing these Applications which should be finalized shortly. It is anticipated that the Applications will be considered by the Village of South Blooming Grove Planning Board in August, 2014.

7.      In connection with the Applications, the Debtor has conducted various preliminary studies, all of which have been positive to date. Additionally, the Debtor will be required to obtain a number of other studies for the Environmental Impact Statement (EIS). The EIS is filed after a lead agency is designated for the Project.

## Funding Requirements

8.    It is anticipated that the Project will cost approximately $2.5 million (without legal fees) in "soft costs" to complete the myriad of steps needed to obtain final approvals. A final approval is anticipated within eighteen months of submitting the Applications. Additionally, funds are also needed to pay debt service, real estate taxes and insurance while the approval process unfolds at a rate of approximately $60,000 a month.

9.    The Debtor will move forward with the filing of a formal plan of reorganization in bankruptcy prior to obtaining final approval of the Applications so long as the Project has received at least strong preliminary support.

10.    The Debtor has prepared the attached budget annexed hereto as Exhibit "C," itemizing the anticipated expenses to be incurred over the next twelve (12) months. To meet these expenses, the Debtor called a series of meetings with members/investors to develop a fair and reasonable funding program for infusion of new capital.

11.    Based upon these meetings, a series of resolutions were passed that will provide the capital necessary for the Project. The resolutions are designed to encourage all investors to contribute their *pro rata* share, while recognizing that not all of the investors have the same liquidity. However, if the Project is to succeed, it requires financial commitments from everyone. Thus, dilution provisions were established if investors fail to either cure delinquent pre-petition capital contributions, or fail to make all requested post-petition capital contributions.

## Status of the Capital Contributions

12.    Prior to Chapter 11, not all of the investors were fully current with their capital requirements, and one investor, Erno Bodek, failed to make any contributions for several

3

years. As a result, Erno Bodek was deemed to have abandoned his membership interest. A list of the pre-petition capital is annexed hereto as Exhibit "D."

13.    Going forward, the first order of business is to insure that all delinquent pre-petition capital contributions are brought current.   The total delinquencies amounted to $1,392,023.16, including Erno Bodek, who alone owes $700,000.   To date, many of the delinquencies have been paid down or reduced by the investors, with the exception of Bodek, as reflected on Exhibit "D."

14.    Besides the cure of delinquent pre-petition capital contributions, the investors agreed to fund new (post-petition) capital requirements at a rate of $165,000 per month through at least December 31, 2014, to be contributed on a pro rata basis, starting May 1, 2014. The Debtor also wants to be fair with investors who fall behind with respect to on-going post-petition capital requirements and agreed to provide various cure periods and a final ten (10) day amnesty period before a dilution occurs.

15.    As of the commencement of the Chapter 11 case, the Debtor had available capital balance of approximately $950,000. These funds were used to re-launch the Project and pay debt service and carrying costs since the Chapter 11 filing. The capital, however, needs to be replenished and augmented. Hence, the resolutions, and this application to provide a formal structure so investors are clear as to their respective obligations.

## The Resolutions

16.    Formal meetings were held on December 16, 2013 and March 26, 2014 to discuss and pass a number of resolutions, the specific terms of which were then drafted by the undersigned and the proposed resolutions were subsequently circulated to the investors to confirm

4

their agreement to the precise language used. The following five resolutions were unanimously passed and contained approved language:

Resolution No 1.    RESOLVED that Mr. YC Rubin, in conjunction with the Steering Committee, continues to have day-to-day authority to make all operating decisions on behalf of the Company consistent with the budget.  To maintain this authority, Mr. Rubin is required to report to the partners at least once during each six (6) week interval, failing which, and after ten (10) days' notice to Mr. Rubin to provide a report, any partner can request a full meeting of the partners to reevaluate the authority given to Mr. Rubin and the Steering Committee.  Under no circumstances, however, are Mr. Rubin and the Steering Committee authorized to expend funds in excess of $300,000 of budgeted amounts without the approval of the partners.

Resolution No 2.    RESOLVED that Mr. Rubin and the Steering Committee are authorized to make additional calls over the next year, at a rate of $165,000 per month, starting May 1, 2014.  Any partner failing to fund his capital call shall be permitted sixty (60) days to cure same, failing which the delinquent partner will be diluted twenty (20%) percent of his equity interest for every sixty (60) days a capital contribution remains outstanding.  A defaulting partner will be completely diluted (100%) if he is delinquent for a total period of 120 days, measured from the day that the first capital call is requested.  To be fair, even after 100% dilution, a defaulting partner will have a ten (10) day amnesty period to become fully current with respect to all delinquent capital calls up until that point.

Resolution No 3.    RESOLVED that the ex-partner who is delinquent with his pre-bankruptcy capital contributions shall have a one-time extension until May 15, 2014 to negotiate a repayment plan with respect to all unpaid capital contribution satisfactory to Mr. Rubin and the Steering Committee, failing which the ex-partner should no longer be considered a partner in the Company, as previously resolved at the December meeting.  Instead, the ex-partner shall receive a claim for ten (10%) percent of his previous contribution.  The Debtor's partners shall be bound by a Beth Din ruling on this matter should this be challenged by the ex-partner in a Beth Din.

Resolution No 4.    RESOLVED that the Operating Agreement is hereby amended to provide that all decisions affecting the Company are subject to approval by a vote of partners holding at least sixty (60%) percent of the outstanding equity interests.

Resolution No 5.    RESOLVED that the final structure for treatment of capital contributions and funding going forward is as follows:

a.    All partners are required to make good on all pre-petition capital calls and contributions in order to retain an equity interest in the

Company going forward. Any partner that does not make all of his pre-petition capital calls and contributions will no longer be considered a partner, and his prior contributions will be converted into a claim for ten (10%) percent of the amount contributed. This claim is subordinated to all non-insider creditors;

b.     All partners who have made good on their pre-petition capital calls and contributions shall continue to retain an equity interest in the Company going forward. Their pre-petition contributions shall likewise be considered a subordinate claim for ten (10%) percent of the amount contributed;

c.     All partners who make all of their requested post-petition capital calls and contributions shall be entitled to repayment of such contributions if the Company successfully emerges from Chapter 11 with a fifteen (15%) percent preferred annual return albeit on a subordinated basis to non-insider creditors;

d.     Any partner who does not make all of his requested post-petition capital contributions shall not be entitled to the fifteen (15%) percent preferred return and his equity holder may be subject to dilution as above.

## Statutory Basis for Relief Requested

16.     As reflected throughout, the Resolutions are designed to provide a means to fund the Debtor's ongoing operations to insure the Project is adequately financed. As such, approval of the Resolutions should be considered under the provisions of 11 U.S.C. § 364 providing for the financing of the Debtor's operations on a subordinated basis, while converting pre-petition capital to discounted subordinated general claims equal to ten percent of the amounts contributed. This structure does not negatively impact any non-insider creditors due to subordination features, and only creates a tier system among the equity holders and investors. Accordingly, the preferred return given to fully contributing investors is warranted and will ensure the long-term viability of the Project to the benefit of all creditors.

17.     The investors agreed to convert their pre-petition capital to a discounted 10% claim for two reasons. First, it serves as an incentive for investors to become current with pre-

petition delinquencies in order to maintain their membership status. Second, the value of the Property absent development would leave investors with little opportunity to salvage their original investment. Thus, a highly discounted claim equates to roughly what investors could expect to receive in a forced sale scenario.

### Notice

18.    All of the investors have agreed to the Resolutions but they will receive notice of the motion, along with all other creditors and other parties in interest in the case.

19.    Additionally, Erno Bodek has not taken advantage of the opportunity provided by the Debtor to agree to a reasonable timetable to cure his pre-petition capital deficiency. Negotiation could resume however following the filing of this motion. Both Mr. Bodek and his counsel, Robert G. Wise, Esq, are being served with a complete set of motion papers.

WHEREFORE, the Debtor prays for the entry of an Order consistent with the foregoing, and for such other relief as may be proper.

Dated:    New York, New York
          July 11, 2014

Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, NY 10036
(212) 221-5700

By:    _____
       Kevin J. Nash, Esq.
       A Member of the Firm

# EXHIBIT A

# List of Investors

Y C Rubin is the Managing Member

| | | |
|---|---|---|
| 1. | Arnold and Rita Godinger Family Trust | 7.78% |
| 2. | Dobbins Realty LLC | 5.70% |
| 3. | Greenfield Family Trust | 10.26% |
| 4. | JGSBUSA LLC | 11.40% |
| 5. | Leon Pelmutter | 10.00% |
| 6. | Mangin LLC | 11.40% |
| 7. | Shevach Limited Partnership | 5.70% |
| 8. | The Closing Network LLC | 5.56% |
| 9. | The Usher and Miriam Meisels Family Foundation | 2.78% |
| 10. | WBBF Equities LLC | 16.52% |
| 11. | William and Sylvia Lefkowtiz Family Trust | 7.78% |
| 12. | Zalmen Berkovitz | 5.12% |
| | | 100.0% |

# EXHIBIT B

# Operating Agreement

## Keen Equities, LLC

THIS OPERATING AGREEMENT dated as of ___ _Jan  10  06_ (the "Agreement") of Keen Equities, LLC, a New York Limited Liability Company (the "Company") is made and entered into by and between,

WBBF Equities LLC, with an office address at 1600 63rd Street, Brooklyn, New York 11204 ("Member A");

William Lefkowitz, with a residence address of 50 Satmar Drive, Unit 302, Monroe, New York (Member "B");

Israel Lefkowitz with a residence address at 477 Bedford Avenue, Brooklyn, New York 11211, (Member "C");

Zalman Berkovitz with a residence address of 176 Clymer Street, Brooklyn, New York (Member "D");

Elmax, with an office address of 1624 Webster Avenue, Bronx, New York, (Member "E");

Solomon Witrol with a residence address at 80 Hewes Street, Brooklyn, New York 11211, (Member "F");

JGSBUSA LLC, a New York Limited Liability Company, with an office address at 1069 58th Street, Brooklyn, New York 11219, (Member "G");

Erno Bodek, with an office address at 541 West 21st Street, New York, New York 10011, (Member "H");

Moses Greenfield, with an office address at 232 Broadway, Brooklyn, New York 11211, (Member I");

Yehuda Leib Pearlmutter, with an office address at 74 Ross Street, Unit 4N, Brooklyn, New York, (Member "J"); and

The Closing Network LLC, a New York Limited Liability Company, with an office address at ~~163  Taylor  Street~~ _113  Ave I_, Brooklyn, New York ~~11211~~ _11230_, Member ("K"), (collectively the "Members"), as members.

### PRELIMINARY STATEMENT

1

WHEREAS the Members desire to form the Company under the New York Limited Liability Company Act (as amended from time to time, the "Act") for the purpose of carrying on any lawful business, purpose or activity not restricted by the Act or any other applicable law or this Agreement; and

WHEREAS the Company has entered into a contract of sale dated July 19, 2005, (the "Contract") between the Company as purchaser and Lake Anne Realty Corp as Seller (the "Seller") for the purchase of certain parcels of real estate commonly known as Section 41, Block 1, Lots 1.13, 2 and 3 located on the southeast side of Clove Road, Blooming Grove, Orange County, New York, and all improvements thereon (the "Property"); and

WHEREAS the Contract calls for a Purchase Price of $15,000,000.00 to be paid as follows: (i) $250,000.00 which has been paid on the execution of the Contract, $50,000.00 of which has been released to the Seller and the balance of which is to be held in escrow by Profita & Associates, LLC (the "Downpayment") until closing; (ii) the sum of $4,750,000.00 to be paid to Seller upon Closing (the "Balance of the Purchase Price"); and (iii) the sum of $10,000,000.00 via purchase money mortgage from Seller for a term of seven (7) years bearing interest at a rate of Six an One Half Percent (6½%) with self amortizing monthly payments in the amount of One Hundred Forty Eight Thousand Three Hundred Eighty Four Dollars Fifty Three Cents ($148,384.53) (the "Interest"); and

WHEREAS the Members are desirous of developing the Property; and

In that connection, the Members desire to enter into a written agreement, in accordance with the Act, as to the affairs of the Company and the conduct of its business.

RECITALS

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein

contained and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

ARTICLE I

INTRODUCTION

Section 1.1. <u>Certain Definitions</u>.  As used herein, the following terms have the following meanings:

a. "Act" means the Limited Liability Company Act of the State of New York, as from time to time amended.

b. "Agreement" means this Operating Agreement, as the same may be amended from time to time.

c. "Capital Account" is defined in Section 5.3.

d. "Code" means the Internal Revenue Code of 1986, as amended from time to time.

e. "Company" means the limited liability company formed and governed pursuant to this Agreement.

f. "Dissolution Proceeds" means any distribution to the Members arising out of or in connection with the dissolution, winding up and/or liquidation of the Company or its assets.

g. "Distribution Percentage" means, for each Member, the percentage set forth opposite such Member's name, as follows:

| Member | Member Name | Distribution Percentage |
|--------|-------------|-------------------------|
| Member A | WBBF Equities LLC | Four percent (14%) |
| Member B | William Lefkowitz | Fourteen percent (14%) |
| Member C | Israel Lefkowitz | Five percent (5%) |
| Member D | Zalman Berkovitz | Four percent (4%) |
| Member E | Elmax | Ten percent (10%) |
| Member F | Soloman Witriol | Ten percent (10%) |
| Member G | JGSBUSA LLC | Ten percent (10%) |
| Member H | Erno Bodek | Ten percent (10%) |

3

| Member I | Moses Greenfield | Nine percent (9%) |
| Member J | Yehuda Leib Pearlmutter | Nine percent (9%) |
| Member K | The Closing Network LLC | Five percent (5%) |

h. A Member's "Interest" in the Company shall mean (i) that Member's share of the profits and losses of the Company and the right to receive distributions of the Company's assets and (ii) that Member's right to participate in the management and operation of the business and affairs of the Company, including but not limited to the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement or the Act.

i. "Member" means each of Member A, Member B, Member C, Member D, Member E, Member F, Member G, Member H, Member I, Member J and their respective permitted successors and assigns as Members hereunder.

j. "Net Cash Receipts" for the applicable period means the gross receipts of the Company during such period plus any reductions in funded reserves arising out of the reversal of such reserves, less the following: (1) cash operating expenses paid during such period; (2) interest and principal paid during such period on indebtedness of the Company; (3) expenditures for capital improvements and other capital items paid during such period; and (4) additions to funded reserves made during such period. For purposes of the foregoing, (a) gross receipts of the Company shall not include Dissolution Proceeds, or any amount entering into the calculation thereof, and shall not include capital contributions or loans by the Members; (b) reserves for anticipated or contingent liabilities and working capital shall be established for the Company in such amounts as are reasonably determined by the Members; and (c) no deductions from gross receipts of the Company shall be made for amounts paid out of funded reserves.

k. "Person" or "person" shall mean any individual, trust, estate, partnership, association, firm, company, or corporation, or any state or public officer, agency or instrumentality.

l. "Transfer" or "transfer" shall mean sell, assign, convey, donate, bequeath, transfer or otherwise dispose of (otherwise than by an Involuntary Transfer) or contract to transfer.

m. "Treasury Regulation(s)" means the regulations of the United States Department of the

4

Treasury promulgated under the Code, as the same may be amended or supplemented from time to time.

n. "Capital Contribution" shall mean the total value of cash and agreed gross fair market value of property contributed and agreed to be contributed to the Company by the Members.

o. "Initial Capital Contribution" "Continuing Capital Contribution" or "Additional Capital Contribution" shall mean the initial, continuing or additional contribution by the Members to the capital of the Company pursuant to this Agreement, as determined by the Members.

p. "Distribution" shall mean any distribution of cash or other property made by the Company to the Member. None of (i) the repayment of any loan made by the Members to the Company, (ii) any payment of fees to the Members, or (iii) any reimbursement of disbursements shall be considered a Distribution hereunder.

Section 1.2. <u>Formation of the Company</u>. The Members agree to form the Company and to associate themselves as Members in the Company as formed under and pursuant to the provisions of the Act, for the purposes and scope set forth in the Articles of Organization and this Agreement. The Members shall cause to be filed in the appropriate governmental office Articles of Organization that conform to the requirements of the Act in order to constitute the Company as a valid limited liability company under the Act. The costs and expenses associated with its formation shall be borne by the Company. In the event of a conflict between the provisions of this Agreement and the mandatory provisions of the Act or the provisions of the Articles of Organization, such provisions of the Act or the Articles of Organization shall be controlling. To the extent any provision of this Agreement shall be prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make this Agreement effective under the Act.

Section 1.3. <u>Term</u>. The term of the Company commenced upon the filing of the Articles of Organization (the "Effective Date") and shall continue until terminated pursuant to the terms of this Agreement or the Articles of Organization, whichever is sooner.

5

Section 1.4.  Name and Addresses of the Members.  The names and mailing addresses of the Members are as set forth at the beginning of this Agreement.

Section 1.5.  Statutory Agent for Service.  The Company's statutory agent for service shall be Israel Lefkowitz, 477 Bedford Avenue, Brooklyn, New York 11211.

Section 1.6.  Principal Office.  The principal office of the Company shall initially be at 477 Bedford Avenue, Brooklyn, New York 11211, but shall be changed at a future date to an address to be agreed upon by the Members.

ARTICLE II

CAPITAL CONTRIBUTIONS

Section 2.1.  Initial Capital Contributions.  Each Member herein has already made a Capital Contribution in accordance with Section 2.1 attached hereto.

Section 2.2  Capital Contributions.  Each Member shall make quarterly contributions of capital in an amount equal to the percentage of each Members' Distribution Interest multiplied by $600000.00 (the "Quarterly Contribution"). By way of example, a Member controlling a Ten Percent (10%) Distribution Interest would be required to make a Quarterly Contribution of Sixty Thousand Dollars ($60,000.00). The four quarters shall be January 1, April 1, July 1, and October 1. Each Quarterly Contribution shall be made at least Fifteen (15) days prior to the Quarter. Contributions shall be made payable to the Company and shall be deposited into the Company's Capital Bank Account. Quarterly Contributions shall be made through and including January 2013 unless otherwise agreed to by the Members. In the event that any Member shall fail to make a Quarterly Contribution in accordance with the terms herein such Member shall be in default of this Agreement.

6

Section 2.3. <u>Additional Capital Contributions</u>. Notwithstanding anything herein contained to the contrary, the Members agree that commencing on the dated herein capital contributions shall be made in addition to the Quarterly Contributions by the members in their pro rata share in amounts sufficient to constantly maintain in the Company's operating account a balance equal to Five Hundred Thousand Dollars ($500,000.00). Additional Capital Contributions shall be made from time to time and in such amount as determined by the Members (collectively, "Additional Capital Contribution").

Section 2.4. <u>Distributions of Capital, No interest on Capital, Limitations on Contributions</u>. Except as expressly provided in Article III, (1) no Member shall be entitled to withdraw or to receive contributions of or against his or its Capital Contributions, without the prior consent of, and upon the terms and conditions agreed upon by, the other Members, (2) no Member shall be paid interest on any Capital Contribution and (3) no Member shall have any priority over other Members as to contributions or as to compensation by way income except as expressly provided for herein.

ARTICLE III

DISTRIBUTIONS

Section 3.1. <u>Distribution of Net Cash Recipients, Repayment of Members' Loans</u>. Subject to the provisions of Section 9.2 (governing the application of Dissolution Proceeds), the Company's Net Cash Receipts shall be distributed at such time, as the Members shall determine in their absolute discretion, to the Members in proportion to their respective Distribution Percentages. Notwithstanding the foregoing, prior to any Distribution to the Members, all Loans made by Members to the Company shall be repaid to such Members, with interest, on a pro rata basis, in accordance with each Member's percentage of total Loans made to the Company prior to any Distributions.

Section 3.2. <u>Distributions to be made in Cash</u>. Unless otherwise unanimously determined by the Members, all distributions to the Members shall be made in cash and no Member

7

shall have the right to receive distributions or property other than cash either during the term of the Company or upon its dissolution.

ARTICLE IV

ALLOCATION OF PROFITS AND LOSSES

Section 4.1. <u>Allocations with Respect to Tax Matters</u>.

a. Solely for tax purposes, income, gain, loss and deduction with respect to property contributed to the Company by any Member shall (before allocations are made under Section 4.2) be allocated in accordance with Section 704(c) of the Code, Treasury Regulations issued thereunder, and Treasury Regulation paragraph 1.704-1(b)(2)(iv)(g), so as to take account of any variation between the basis of the property to the Company and its fair market value at the time of contribution.

b. For purposes of determining the Members' respective shares of nonrecourse liabilities of the Company under Treasury Regulations paragraph 1.752-3(a)(3), it is hereby specified that each Member's interest in Company profits is his Distribution Percentage.

c. If, during any taxable year of the Company, there is a change in any Member's Interest in the Company, then the Members shall cause the allocations of the Company's income, gain, losses, deductions and credits (and items thereof) to be made in a manner which takes into account the varying interests of the members of the Company during such taxable year in accordance with Code Section 706(d) and the Treasury Regulations thereunder.

Section 4.2. <u>Profits</u>.  Subject to Section 4.1, the Company's income and gain (and items thereof), for each fiscal year of the Company, shall be allocated among the Members (for both book and tax purposes) in proportion to their respective Distribution Percentages.

Section 4.3. <u>Losses</u>. Notwithstanding anything herein contained to the contrary, losses, deductions, depreciation and credits (and items thereof) for each fiscal year of the Company, shall be allocated among the Members in the proportion to their respective

8

Distribution Percentages.

ARTICLE V

ACCOUNTING AND RECORDS

Section 5.1. <u>Accounting Methods</u>. The Company books and records shall be prepared in accordance with generally accepted accounting principals, consistently applied, except that the Members' Capital Accounts shall be maintained as provided in this Agreement. The Company shall be on an accrual basis for both tax and accounting purposes, unless the members agree otherwise. Israel Lefkowitz is hereby designed as the "tax matters partner" for the Company (as such term is defined in Section 6231(a)(7) of the Code).

Section 5.2. <u>Fiscal Year</u>. The fiscal year of the Company shall be the twelve calendar month period ending on the 31st of December in each calendar year.

Section 5.3. <u>Capital Accounts</u>. A capital account ("Capital Account") shall be established for each Member and determined, maintained and adjusted in accordance with Treasury Regulation paragraph 1.704-1(b)(2)(iv) and in accordance with the provisions of this Agreement. The Capital Accounts of the Members shall be adjusted upon each distribution of property by the Company to a Member to the extent required by and in the manner described in Treasury Regulation paragraph 1.704(b)(2)(iv)(e).

Section 5.4. <u>Access to Accounting Records</u>. There shall be maintained at the office of the Company, or such other place as the Members agree, and same shall be made available to all Members at all times, upon reasonable notice, the books and records of the Company. The Company shall maintain the following records at its office, or at such other place as the Members agree, (i) a balance sheet for the Company as of the last day of the preceding calendar month, an itemized statement of the revenues and expenses of the Company during such calendar month showing profits and losses during such month, and a statement showing the sources and uses of the Company's funds during such calendar

9

month, (said statement to be faxed to the Members of the Company on a monthly basis) and the underlying statements, bills and invoices therefore, and (ii) within Ninety days after the end of each Fiscal Year or such longer period as may be permitted under applicable law, such documents, instruments and certificates as shall be necessary for the Members to prepare their federal, state and local tax returns for such Fiscal Year. At the request of any Member any financial statement described in this paragraph shall be reviewed by an independent accountant or firm of accountants retained by the Company. The Members shall maintain and preserve, at the office of the Company or such other place as the Members agree, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

Section 5.5 <u>Tax Characterization</u>. It is intended that the Company be characterized and treated as a partnership for federal, state and local income tax purposes. For such purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a Partner, to Partners and to Partnership in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company respectively.

ARTICLE VI

MANAGEMENT

Section 6.1. <u>Management vested in Members, Members' Powers</u>.

a. The business affairs of the Company shall be managed by the Members pursuant to the rules contained in the Act for limited liability companies in which management is not vested in managers. The Members shall direct, manage, and control the business of the Company. The Members shall have full authority, power and discretion to manage and control the business affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all

other acts or activities customary or incident to the management of Company business, unless otherwise provided for in the Act or this Agreement.

b. The foregoing notwithstanding, the Members have requested Israel Lefkowitz to administer the day-to-day operations of the Company. Israel Lefkowitz (the "Administrator") shall be paid a yearly salary in an amount equal to Twenty Thousand Dollars ($20,000.00) to be paid in equal monthly installments.

   a. The Administrator's duties shall be to administer the day-to-day operations of the Company, including, the letting of apartments and houses on the Property, the monthly collection of rent therefore, the institution of proceedings to collect such rents, the repairs and maintenance of the Property and the structures and systems erected thereon.

   b. In addition, the Administrator shall be responsible to maintain accurate records of the Company's day-to-day operations and to inform the Members of the details of such operations in writing on a Quarterly basis.

   c. In addition, the Administrator shall be responsible for the development of the Property, including scheduling and meeting with architects, engineers, town boards, local and state agencies, and professionals. Such development however, shall closely follow the instructions of the Members herein.

c. Notwithstanding anything herein contained to the contrary, consent of Members holding a Sixty Percent (60%) Interest in the Company shall be necessary for any of the following actions:

   1. The sale acquisition or transfer of any part or all of the Property, or any merger, or consolidation of the Company;

   2. Application for and acceptance of financing and the acceptance of any other financing terms and conditions, or the signing of any documents related thereto.

   3. Ongoing Budgets;

   4. Marketing plans and expenses;

   5. Costs and expenses that exceed the Budget by more than Ten Percent (10%);

   6. Changes in zoning designations;

11

7. The hiring of attorneys, accountants, architects, engineers, professionals and managing agents;

8. The making or incurring of any capital expenditure that is not ordinary, usual and recurring, above Fifty thousand Dollars ($50,000.00);

9. To invest company funds, (by way of example but not limitation) in time deposits, short term government obligations, commercial paper or other investments;

10. The distribution of funds to any person or entity unless such person or entity is a bona fide vendor of the Company;

11. Pledging, hypothecating or otherwise encumbering the Company or any Members' interest therein or any assets owned by the Company.

12. To execute on behalf of the Company all instruments and documents, including, without limitation, notes, negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; leases; partnership agreements, operating agreements of other limited liability companies; and any other instruments or documents necessary or appropriate, in the opinion of the Members, to the business of the Company;

d. Unless authorized to so do by this Agreement or by written authorization of all the Members, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose

Section 6.2. <u>Bank Accounts</u>. An operating bank account (the "Operating Bank Account") shall be opened in the name of the Company, and Member D (Israel Lefkowitz), Member E, (Zalman Berkovitz) and Member G (Solomon Witriol) and shall each be signators thereon. Only ordinary, customary, usual and recurring drafts and checks shall be written from the Operating Bank Account. In addition, a capital bank account (the "Capital Bank Account") shall be established in the name of the Company, and Member A (Sigmond Brach), Member E (Israel Berkovitz), Member F (Elmax) and Member G (Solomon

12

Witriol) shall be signatories thereon. Any check or draft that shall be equal to or in excess of Fifty Thousand Dollars ($50,000.00) that shall originate from the Capital Bank Account shall require the signature of two of the signatories of the Capital Bank Account. The statements for the Operating Bank Account and the Capital Bank Account shall be kept at the company's office, and all Members shall have access to said accounts via the Internet.

Section 6.3. <u>Members' Duty to the Company</u>.  The Members of the Company shall be required to faithfully perform on behalf of the Company in the best interest of the Company. In the event that a Member does not faithfully perform his duty to the Company then that Member shall be in Default which Default shall be governed by Article X herein. Notwithstanding the foregoing, each Member shall be free to invest in other investment opportunities with the need to first offer such opportunities to the Company or the Members.

Section 6.4. <u>Reimbursement of Members' Expenses and Compensation</u>. Each Member shall be reimbursed by the Company for all reasonable out-of-pocket expenses properly incurred by him in connection with the discharge of his obligations under this Agreement or otherwise properly incurred on behalf of the Company. Members shall be compensated on such terms and conditions as may be determined by the Members.

ARTICLE VII

MEETING AND VOTING

Section 7.1. <u>Meetings</u>.  Meeting of the Members, for any purpose or purposes may be called by any Member.  The request for a meeting shall state the purpose or purposes, of the proposed meeting, but the Members shall be free to address other Company matters during such meetings.

Section 7.2. <u>Notice of Meetings</u>.  Notice of each meeting of Members stating the purpose,

13

place, date and hour of meeting shall give to each Member entitled to a vote at such meeting not less than twenty-four hours nor more than five days before the date of the meeting. Attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except when the Member attends a meeting for the express and exclusive purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened.

Section 7.3 <u>Quarterly Meetings</u>. Anything herein contained to the contrary notwithstanding, the Company shall hold Quarterly meetings at such time and place as the Members shall agree. At such quarterly meetings the books, accounts and records of the Company shall be open for all Members to review, a balance sheet for the Company shall be prepared by the Administrator detailing the accounts, income, expenses and liabilities of the Company, and the Administrator shall give a report of the Company's state of affairs.

Section 7.4. <u>Actions and Voting By Members</u>.    At any meeting, the vote of Members holding more than fifty percent (50%) of the Distribution Percentages owned, by all of the Members then entitled to vote shall decide any question brought before such meeting, unless the question is one upon which, by express provision of the Act, the Articles of Organization or this Agreement, a different vote is required, in which case, such express provision shall control.

Section 7.5. <u>Deadlock</u>. The Members anticipate and intend that in managing the affairs of the Company, they will work closely with each other.  Decisions generally will be made informally by consensus.  The Members each agree to work with each other and to govern their actions by what each in good faith believes is in the best interest of the Company.  In the event a Member informally has made a proposal and no consensus has been obtained on the proposal within Ten days of its submission to all Members (a "Deadlock"), the proposal will be submitted, to an arbitration panel for arbitration. The panel shall consist of three or more persons listed on Schedule 2.2 attached hereto and made a part hereof.

14

Each proponent and each opponent of a proposal shall choose one arbitrator listed on Schedule 2.2, and in the event that there is an even number of arbitrators, the arbitrators so chosen shall choose a final arbitrator from Schedule 2.2. The procedure set forth in this Section 7.5 shall be the exclusive procedure for resolving Deadlocks, and each Member agrees that he will not commence an action under any applicable provision of the Act to resolve a Deadlock or otherwise dissolve and wind-up the affairs of the Company.

ARTICLE VIII

TRANSFER OF A MEMBER'S INTEREST

Section 8.1. <u>Prohibited Transfers</u>. Except as specifically provided for in this Article VIII, no Member shall voluntarily or involuntarily sell, assign, convey, give, pledge, hypothecate, syndicate, grant a security interest in, grant an option to purchase or right of first refusal or offer, encumber or otherwise transfer, directly or indirectly, by operation of law or otherwise, (collectively "Transfer") any of its legal, beneficial, economic or other right, title or interest in the Company or any part thereof, or cause or suffer the Transfer of any direct or indirect interest in such Member, without the prior written consent of the Members. Any other Transfer other than pursuant to this Article VIII or without such consent shall be null and void and of no effect whatsoever.

Section 8.2. <u>Permitted Transfer</u>. Subject to the requirements of this Article VIII, the following Transfers shall be permitted without the consent of any other Member ("Permitted Transfer"): (i) a Transfer to an entity of which a Member has a majority ownership interest; (ii) a transfer by will or intestacy; (iii) a Transfer to a parent, child, spouse, grandchild or sibling of a Member, or to any trust or entity for the benefit of such individual, provided, however, that such Member retains, to the extent permitted by law, voting rights on any interest so transferred.

Section 8.3. <u>Admission to Membership</u>. From and after the Effective Date, any Person may

15

become a Member with the consent of and upon such terms as may be determined by the Members, provided however, that any Person who is a transferee of an interest of the Company as a result of a Transfer permitted by Section 8.2 or 8.4 herein, may become such a Member without such consent. However, no such transferee and no Member, shall become a Member until it shall have executed and delivered to each Member an agreement in which such transferee or Member assumes and agrees to be bound by all of the terms and conditions of this Agreement. And any Person desiring to become a Member must purchase or have transferred to such Member at least a Five Percent (5%) Membership Interest of the Company.

Section 8.4. <u>Right of First Refusal</u>. Notwithstanding Section 8.1 herein to the contrary, each Member shall have a right to transfer its entire Membership Interest subject to the terms set forth in this Section 8.4, Section 8.3 and 8.2 herein.

a. If a Member (the "Selling Member") has entered into a binding agreement to sell its entire, or a portion (equaling at least a Five Percent (5%) Memebership Interest in accordance with Section 8.3 herein) of its Membership Interest to a third party, and such Transfer does not constitute a Permitted Transfer, the Selling Member shall provide written notice (the "Sale Notice") thereof to the other Members (the "Purchasing Members") which notice shall include a copy of the agreement with such third party.

b. Within 30 days after receipt of such Sale Notice each of the Purchasing Members shall have the right, by notice to all Members, to elect to purchase a pro rata share of the Selling Member's interest in the Company on the same terms and conditions set forth in the third party agreement at price to be pro rated between the Members in accordance with their purchasing Interest. If any Member declines to purchase the Selling Members interest, the other Member(s) may purchase such interest on the same terms in accordance with this paragraph 8.4.b.

c. If any Member elects to purchase the Selling Member's interest, then within 20

16

business days after such election, such Purchasing Member(s) shall deposit the downpayment in escrow with the Selling Member's attorney and the parties shall close the transaction in accordance with the terms of the third party agreement.

d. If none of the Member(s) elect to purchase the Selling Member's interest, the Selling Member shall have the right, within 90 days to sell its interest in accordance with the terms set forth in the Sale Notice.

Section 8.5 <u>Sale of Lots</u>. In the event that the Company places certain parcels of the Property up for sale, the Members shall have the first right to purchase such lots on the same terms that are accepted by the Company.

ARTICLE IX

DISSOLUTION OF THE COMPANY

Section 9.1. <u>Dissolution</u>. The Company shall dissolve upon the happening of the first to occur of the events listed in Section 42 of the Act, provided, however, that dissolution occurs by virtue of an event of dissociation (as such term is defined in Section 41 of the Act) and, after giving effect to such dissociation there would remain two or more Members, the remaining Members may, by unanimous agreement reached by them no later than ninety days following the event of dissociation, decide to continue the Company's business.

Section 9.2. <u>Death of a Member</u>. Notwithstanding the provisions of Section 9.1, the death of a Member shall not dissolve the Company. The representative of the deceased Member's estate shall assign the deceased Member's Interest in the Company in accordance with Section 8.2 herein.

ARTICLE X

GENERAL

17

Section 10.1.    Notices.    Any notice, request, approval, consent, demand or other communication required or permitted hereunder shall be given in writing by (1) personal delivery, (2) expedited delivery service with proof of delivery, (3) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (4) prepaid telegram, facsimile or telex (provided that such telegram, facsimile or telex is confirmed by the receiving party), and shall be delivered to each party at his respective address set forth at the beginning of this Agreement (or in the case of the Company, the principal office address established pursuant to Section 1.6 hereof), or to such different address as such addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given and received either at the time of personal delivery or, in the case of delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of the telegram, facsimile or telex, upon confirmation of receipt.

Section 10.2. Amendments. This Agreement may be amended by a written agreement or amendment executed by all the Members, but not otherwise.    No variations, modifications, amendments or changes herein or hereof shall be binding upon any party hereto unless set forth in a document duly executed by or on behalf of such party.

Section 10.3.    Miscellaneous.    This Agreement supersedes any prior agreement or understandings between the parties with respect to the Company.    This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of New York.    Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of their respective heirs, legal representatives, successors and assigns. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder provision or any other persons of circumstances, shall not be affected thereby. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

Section 10.4. <u>Defaults</u>. Each of the following events, if the same shall continue for 10 days after an additional notice is delivered from a Member not committing the act set forth below to the Member which committed said event, shall constitute an event of default ("Event of Default") hereunder:

a. If any Member fails to make any Quarterly Capital Contribution or Additional Capital Contribution to the Company which is required to be made under this Agreement, within 3 days after notice from another Member that such Member failed to make said Contribution, shall constitute an Event of Default.

b. If any Member defaults in the observance or performance of any term, covenant or condition of this Agreement, other than a default in making a Quarterly Capital Contribution or Additional Capital Contribution, or a Member defaults by failing to faithfully and diligently carry out its duties to the Company, or a Member defaults by failing to follow the provisions herein concerning a deadlock and such default continues for 10 days after such Member receives notice thereof from another Member (or if such default cannot be reasonably cured within such 10 day period by virtue of the nature of the default, and such Member does not commence to cure such default within such period and thereafter diligently prosecute such cure to completion); or

c. If any act or omission of a Member causes an Event of Default (beyond applicable notice and grace periods) to occur under any indebtedness of the Company; or

d. Any default by a Member under the Right of First Refusal hereunder.


10.5. <u>Remedies for Default</u>. If a Member (the "Defaulting Member") has caused an Event of Default hereunder, then the other Member(s) jointly (each as to its pro rata interest) (collectively the "Non Defaulting Member(s)") may exercise any one or more of the remedies below.

a. In the event that the default is one enumerated in Section 10.4.a herein, such defaulting Member shall be assessed a penalty to be paid to the Company in an amount equal to

i. Five Percent (5%) of the outstanding contribution if such defaulted

contribution is made within 30 days of the due date;

 ii. Ten Percent (10%) of the outstanding contribution if such defaulted contribution is made within 60 days of the due date;

 iii. Fifteen Percent (15%) of the outstanding contribution if such defaulted contribution is made within 90 days of the due date; and

 iv. Twenty Percent (20%) of the outstanding contribution if such defaulted contribution is made within 120 days of the due date due.

b. If the failure to make a contribution in accordance with Section 10.4.a herein shall continue for a period of Six (6) months from the due date, then the defaulting Member's Interest in the Company shall be diluted in a percentage equal to the capital contributions made by the defaulting Member over the total capital contributions that should have been made by such defaulting Member (the "Dilution Percentage"). Such Dilution Percentage of the defaulting member's Interest shall be distributed among the Members in accordance with the Members' pro rata share in the Company.

c. If an event that the Default is one enumerated in Section 10.4.b, 10.4.c or 10.4.d, then the remedy for the defaulting member shall be determined by an arbitration panel in accordance with Section 7.5 herein.

d. If (and only if) a member becomes a Defaulting Member, all amounts, payments, and proceeds which may become distributable or payable by the Company to such Defaulting Member which are secured by a security interest created pursuant to the above paragraph, shall be paid to the Non Defaulting Member(s) until all amounts due to the Non Defaulting Member(s) have been paid in full, but shall nevertheless be deemed to have been distributed to the Defaulting Member.

e. Any Event of Default that is in dispute as to whether such Event is an Event of Default shall be resolved by binding arbitration in accordance with section 7.5 herein.

Section 10.6 Exculpation; Indemnification.

20

a. No Member shall be liable in damages or otherwise to the Company or any other Member for any act or omission performed or omitted by him in good faith on behalf of the Company and reasonably believed by him to be within the scope of the authority granted to him by this Agreement, except for willful misconduct or gross negligence. For purposes of this subparagraph (a), any act or omission performed or omitted on advice of independent legal counsel, architect, engineer or accountant to the Company shall be conclusively deemed to have been performed or omitted in good faith.

b. No Member shall be liable to the Company or to any other Member for losses or liability arising from the conduct of any employee or agent of the Company, provided, however, that such losses or liabilities do not arise from the willful misconduct or negligence of that Member.

c. The Company shall indemnify and save harmless the Members from any loss or liability (including any and all costs, fines, penalties and other expenses connected therewith plus attorneys' fees actually and necessarily incurred) incurred by reason of being a Member or on account of any act or omission performed or omitted in good faith on behalf of the Company and reasonably believed to be within the scope of the authority granted to him by this Agreement, except for willful misconduct or gross negligence. The indemnification provided by this paragraph (c) shall not be deemed exclusive of any other rights to which a Member may be entitled under any agreement, vote of the Members or otherwise, and shall continue as to a person who has ceased to be a Member and shall inure to the benefit of the heirs, executors and administrators of such a person.

d. The parties hereto agree that Charles J. Rubinstein represented the interests of Member A and Member B and that all the Members have been informed of same and that they shall all hold Charles J. Rubinstein harmless for same. In addition, the Members understand that Charles J. Rubinstein has, is, or may represent any or all of the Members on issues related to or unrelated to this Agreement

Facsimile signatures on this agreement shall have the same force and effect as

21

executed originals.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

Members:

_____
Sigmond Brach (Member A)

_____
William Lefkowitz (Member C)

_____
Zalman Berkovitz (Member E)

_____
Solomon Witrol (Member G)

_____
Erno Bodek (Member I)

_____
Yehuda Leib Pearlmutter (Member K)

_____
WBBF Equities LLC (Member B)
By:

_____
Israel Lefkowitz (Member D)

_____
Elmax (Member F)

_____
JGSBUSA LLC (Member H)
By: Jacob Gold

_____
Moses Greenfield (Member J)

_____
The Closing Network LLC (Member L)
By:

Schedule 2.1
Initial Capital Contributions

22

Schedule 2.2
Arbitrators

23

# EXHIBIT C

# **BUDGET**

2014 Cash Requirements
| | |
|---|---|
| Expended to Date | $965,407.83 |
| Projected Expenses as itemized below through | $1,543,985.12 |
| December 31, 2014 including debt service, taxes, etc. | |
| Total | $2,509,393.65 |

Amounts Expended to Date
| | |
|---|---|
| Legal Fees Prior to Bankruptcy (Pre-Petition Retainers) | $50,000.00 |
| CPC and Related Studies | $632,014.18 |
| Adequate Protection | $169,934.84 |
| Utilities and Misc | $16,145.08 |
| Insurance | $12,767.40 |
| Taxes | $81,621.33 |
| US Trustee | $2,925.00 |
| Total Amounts Expended to Date from Existing Capital | $965,407.83 |

Projected Budget First Half 2015
| | |
|---|---|
| CPC Budget | $590,000.00 |
| Adequate Protection | $186,000.00 |
| Taxes | $85,000.00 |
| Utilities | $15,000.00 |
| Insurance | $20,000.00 |
| Misc | $100,000.00 |
| Total Projected Cash Needs First Half 2015 | $996,000.00 |

# EXHIBIT D

## Schedule of Pre-Petition Capital

| Member | Pre-Petition Delinquencies | Current Balance Due |
|--------|---------------------------|---------------------|
| WBBF Equities LLC | $39,371.40 | $0.00 |
| William and Sylvia Lefkowitz Family Trust | $16,800.00 | $0.00 |
| Zalmen Berkovitz | $26,183.00 | $0.00 |
| Mangin LLC | $118,780.00 | $38,787.00[1] |
| JGSBUSA LLC | $94,419.60 | $0.00 |
| Greenfield Family Trust | $42,490.30 | $0.00 |
| Leon Perlmutter | $259,950.00 | $219,950.00[2] |
| Dobbins Realty LLC | $97,021.86 | $47,137.86[3] |
| Erno Bodek | $703,000.00 | $703,000.00[4] |

---

[1] To be paid by July 30, 2014.
[2] To be paid at a rate of $10,000 per month through December 31, 2014, with the terms for payment of the   balance to be thereafter negotiated but not less than $10,000 per month.
[3] To be paid by December 31, 2014 at a rate of close to $10,000 per month.
[4] No serious proposal.