1
               UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF NEW YORK

2

3

In re:                  .   Brooklyn, New York
4
                    .   October 22, 2015
KEEN EQUITIES, LLC,     .
5
                    .   13-46782-nhl
6          Debtor.    .   Calendar Time:
. . . . . . . . . . . . . . .   12:00 P.M.
7

8
              ADJ [8] STATUS CONFERENCE
9

10  [85] MOTION TO OBJECT/RECLASSIFY/REDUCE/EXPUNGE CLAIMS:
    FILED BY J. TED DONOVAN ON BEHALF OF KEEN EQUITIES, LLC.
11

12   [119] NOTICE OF HEARING ON DISCLOSURE STATEMENT FILED
     BY J. TED DONOVAN ON BEHALF OF KEEN EQUITIES, LLC
13    (RE:  RELATED DOCUMENT(S) [118] AMENDED DISCLOSURE
      STATEMENT FILED BY DEBTOR, KEEN EQUITIES, LLC)
14

15   [102] NOTICE OF [100] MEMORANDUM OF LAW IN RESPONSE
   AND CROSS MOTION FOR RELIEF FROM STAY TO ALLOW STATE
16    COURT TO CONFIRM THE REPORT OF THE REFEREE AND
     DETERMINE THE AMOUNT OF THEIR POST-PETITION
17   SECURED CLAIM.  FEE AMOUNT $176.  FILED BY JEFFREY
  A. COOPER ON BEHALF OF DAVID A. GREENE, HAL J. GREENE
18  LIVING TRUST, TRUST U/W M. GREENE FBO SABRINA GREENE
   (RE:  RELATED DOCUMENT(S) [85] MOTION TO OBJECT/
19      RECLASSIFY/REDUCE/EXPUNGE CLAIMS
20      BEFORE HONORABLE NANCY HERSHEY LORD

21

22 Attorney for Debtor:     GOLDBERG WEPRIN FINKEL GOLDSTEIN,
                       LLP
23                    1501 Broadway
                    22nd Floor
24                    New York, New York  10036
                    BY:  KEVIN J. NASH, ESQ.
25

1

2
Attorney for Greene Family
Interests:                    RABINOWITZ, LUBETKIN & TULLY,
                              LLC
4
                              293 Eisenhower Parkway
5                             Suite 100
                              Livingston, New Jersey  07039
6                             BY:  JONATHAN I. RABINOWITZ,
                              ESQ.
7                                  JEFFREY A. COOPER, ESQ.

8

9
Court Recorder Operator:      DAVIDA CAPERS
10

11
Court Transcriber:            CATHERINE ALDRICH
12                            COMPU-SCRIBE, INC.
                              2376 Cleveland Street
13                            Bellmore, New York  11710

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings recorded by electronic sound recording,

3

1

2
transcript produced by transcription service.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  In the case of Keen Equities, LLC, matters

2  6 through 9.

3          THE COURT:  Appearances, please.

4          MR. NASH:  Yes, your Honor.  Kevin Nash for the debtor.

5          MR. RABINOWITZ:  Good afternoon, your Honor.  Jon

6  Rabinowitz and Jeffrey Cooper of Rabinowitz, Lubetkin & Tully

7  on behalf of the secured creditor, the Greene Family Interests.

8          THE COURT:  Peace does not reign, huh?

9          MR. NASH:  Well, we both agree not to agree.  That's

10  a start, Judge.

11          THE COURT:  This is a good start.

12          MR. NASH:  It is.

13          THE COURT:  To find common ground.

14          MR. NASH:  We like Howie Rose.  We think Darling's good

15  on TV.  So there is common ground.

16          MR. NASH:  Your Honor, we --

17          THE COURT:  I have excused the Office of the United

18  States Trustee.  This change in time I think made life a little

19  difficult for them, so we have an e-mail though, right?

20          THE CLERK:  There was a letter they filed in the docket.

21          THE COURT:  Just a second.  Just quickly go over that

22  so I know I've done it.  I've got it.

23                    (Pause in Proceedings)

24          THE COURT:  Okay.  They filed a statement of

1  non-objection to the disclosure statement, but the status part,

2  the Court, they advised me the debtor's current on the filing

3  of monthly operating reports.  Quarterly fees for the third

4  quarter of 2015 in the amount of $4,875 are due by the end of

5  October, and Mr. Nash has been made aware of the Trustee's

6  unavailability.  Okay.  So that's where we are with status.

7  Operating reports are good.  You're going to owe some money in

8   a few days.  Okay.  Let's take it from there.

9        MR. NASH:  Your Honor, we haven't been before the Court

10  in a few months, but as you will recall this is a development

11  that is proceeding in upstate New York, and so the development

12  is a critical aspect of this, but we're really here today on the

13  issues regarding the amount of the secured creditor's claim, and

14  I did file a set of objections to the claimant.  Just if your

15  Honor will recall, we had various interim stipulations that were

16  entered, and then there was a settlement stipulation of certain

17  issues as to the post-petition payments, and that put together

18  under that stipulation a time frame for the filing of objections.

19        THE COURT:  All right.  We have a milestone date?

20        MR. NASH:  Yes.  A milestone date, and some of them

21  were extended on consent, but by and large they were filed when

22  they needed to be filed, and we're here today to see where we

23  are going on the objection.

24        My major thrust on the objection is the entitlement

to default interest based upon what I consider an improper and
deficient notice, which then invalidates a purported termination
or acceleration of the loan, and in conjunction with that I've
also filed my plan and disclosure -- my plan of reorganization
and disclosure statement, and the thought under that stipulation
was they would run in tandem, and we would probably get to the
finish line at or about the same time, and the plan provides for
a treatment of the secured debt, payment of the allowed amount
with a substantial pay-down, and monthly payments of $100,000
per month.

Where the parties, differ, Judge is over default
interest, which is about, according to my objection, a $1.8 million
spread between regular interest and default interest, and now
what's coming up is we're going to have to deal with it, although
I thought it was dealt with previously, is there's a claim now
that I think is going to arise for default interest on a
post-petition basis, even though I think the stipulation we
previously entered did not provide for that.  It provided for
regular non-default interest, and we did increase the amount to
cover the entire debt, not just the principal balance, but --

THE COURT:  All right.  You said -- I mean the other
issue that seems to me besides the amount of the claim under the
plan is going to be your risk factor.

MR. NASH:  The risk factor, yes.

1          THE COURT:  It's not just the amount of the claim.

2  It's the risk --

3          MR. NASH:  No, no, but that's -- there will always be

4  a feasibility risk factor in the till analysis, and in terms of

5  that, you know, we're prepared to put on substantial evidence,

6  and I think the record of this case is evidence.  We have never

7  missed a payment.

8          THE COURT:  Wait.  Let's not jump for a minute.  Let's

9  just try to figure this out one thing at a time.  I have a contested

10  claims objection process, now with a cross motion that says,

11  "Judge, let us, you know, give you a free afternoon.  We'll go

12  get this figured out somewhere else, or at least part of it figured

13  out somewhere else," and putting aside that part, with respect

14  to the objection to claim separating out issues of Rooker-Feldman

15  or collateral estoppel or you're too late, whatever it may be,

16  do we have any issues of fact that require discovery on the

17  contested claim objection?

18          MR. NASH:  I think we did.  I think the critical --

19          THE COURT:  Well, I'll hear from both of you.

20          MR. NASH:  Yes.  I think the critical -- well, I think

21  that they -- the lender would likely agree that there's an issue

22  of fact.  Their position is I can't even raise it at this point,

23  but I do think there's an issue of a very significant fact in

24  terms of the mailing of that October 2010 notice.

1          THE COURT:  Okay.  So that's an issue of fact that was
2     part of this state court process?
3          MR. NASH:  Not directly, but it would have came up I
4     think in the issue on the motion.
5          THE COURT:  What is it that you're -- what is it that
6     wasn't properly mailed in your estimation?
7          MR. NASH:  There was one notice.  It's one of the
8     exhibits.  It's a very cryptic notice.
9          THE COURT:  About?
10         MR. NASH:  That the loan is in default.
11         THE COURT:  Oh, okay.
12         MR. NASH:  And under the loan documents, that notice
13    had to be directed to the debtor in care of Leo Saltzman.  It
14    had to be sent a certain way, and it had to be I think clear that
15    it was going to trigger an acceleration, and that there would
16    be consequences flowing therefrom.  It was a very cryptic notice
17    that was not properly noticed to the debtor.  There's an issue
18    of whether other parties got it indirectly under additional
19    mailings.  There's disputes as to that.  The lender was only able
20    to put together one mailing.
21         THE COURT:  Again, that was what led up to the
22    foreclosure?
23         MR. NASH:  Yes.  Yes.  There was --
24         THE COURT:  Okay.  Let me see if we can separate this

1  out for a minute.  Putting aside those kinds of issues --

2          MR. NASH:  Right.

3          THE COURT:  -- with respect to the claim amount, you're

4  saying the question of whether or not -- okay.  So you're saying

5  the question of whether or not they properly have a claim that

6  includes this default interest would go to whether or not it was

7  properly accelerated, and you're going to -- you have issues of

8  fact on that --

9          MR. NASH:  Right.

10          THE COURT:  -- with respect to the notice, all right,

11  but separate and apart from that what we have here is an analysis

12  of the documents, right?

13          MR. NASH:  An analysis of the documents.

14          THE COURT:  Okay.  So I just want to know if there are

15  any other issues.  If you separate out and just talk about the

16  claims objection process, there are no issues for discovery, are

17  there?

18          MR. NASH:  I think there are.  I think that we've been

19  noticed for depositions, and I would notice them for depositions

20  on how this notice was actually prepared, delivered, and received,

21  and I think there's a fundamental factual dispute on our end and

22  on their end.

23          THE COURT:  Okay.  But they say you can't raise it and

24  you say you can?

1          MR. NASH:  Right.

2          THE COURT:  Okay.  So I have an issue of law to

3     determine before I have -- before I can figure out if we have

4     an issue of fact that needs discovery?

5          MR. NASH:  Right.

6          MR. RABINOWITZ:  Your Honor, would it be

7     appropriate --

8          THE COURT:  No.  You can --

9          MR. RABINOWITZ:  It's not my intent to cut off Mr.

10    Nash's --

11         THE COURT:  No.  I'm looking at you to see if so far

12    so good or I screwed up.

13         MR. RABINOWITZ:  Your Honor has identified the issues.

14     Here is where we differ with the debtor with regard to a disputed

15    issue of fact.  Their essential defense is we're not entitled

16    to default interest because there was an inappropriate notice

17    of default and no acceleration.  In the absence of a notice of

18    default there's no event of default and there can be no

19    acceleration, and hence, we're not entitled to default interest.

20         We respond with one argument.  In addition to they can't

21    raise it, we'll have an opportunity to discuss the can't raise

22    it kinds of issues, whether it's Rooker-Feldman, issue of

23    preclusion, whatever it is, waiver we have argued that there is

24    an event of default under the terms of the mortgage, that is

paragraph 13(b), which says that, "The non-payment of interest

for more than 15 days is an event of default," and that particular

definition of an event of default does not require notice, so

that if the debtor's sole argument with regard to why we're not

entitled to default interest is we never gave a notice of default,

there is our position that 13(b) does not require any notice,

and that could be decided without getting in a contested hearing

and discovery with respect to whether an appropriate notice of

default was given in addition to the legal issues that your Honor

has identified, to wit they can't raise it or they have waived

it.

THE COURT:  Just refresh me because I haven't -- where

-- you were up to the point of -- you got a report of the referee,

but it was not confirmed, correct?

MR. NASH:  That's correct.

MR. RABINOWITZ:  That is correct, your Honor.

THE COURT:  Then what would be --

MR. NASH:  So if we were in state court --

THE COURT:  Yes.  Tell me if you were in state

court --

MR. NASH:  If we were in state court there would have

been -- they would have had to make a motion to confirm the report.

We would have opposed that motion and said the calculation of

default interest on the report was improper, and that is because

1  under paragraph 10 of the note which governs the imposition of

2  default interest, under paragraph 10 in the note you have to have

3  a declared notice event of default.

4          THE COURT:  Would you have argued that that opposition

5  was not timely or would that opposition be timely in state court?

6          MR. RABINOWITZ:  Well, your Honor, we would argue, and

7  in our substantive argument we have argued and I will in greater

8  detail that the determination of the entitlement to default

9  interest was made by the state court judge, not by the referee.

10  The reference from the state court judge to the referee was simply

11  to calculate the quantum of damages based upon a previous

12  determination that said we're entitled to default interest, and

13  that previous determination was based upon allegations in the

14  complaint that said that there was an event of default and there

15  was an acceleration.

16          We moved for summary judgment, and on those allegations

17  summary judgment was granted.  So the state court has already

18  determined that issue, and the confirmation of the referee's

19  report, this is respectfully I think a little bit of a red herring,

20  the confirmation of the referee's report is simply to confirm

21  the arithmetic calculation of those damages.

22          THE COURT:  That's why --

23          MR. NASH:  No.  That's where I disagree.

24          THE COURT:  It's not a red herring.  That's why I asked

1 the question.

2          MR. RABINOWITZ:  I understand.  That wasn't directed

3 at your Honor.

4          THE COURT:  Okay.

5          MR. RABINOWITZ:  No, no.  With regard to -- your Honor

6 has asked me do we think there's a disputed issue of fact or not,

7 and since the state court judge has made that determination of

8 liability based upon those allegations, all the referee was

9 authorized to do was to calculate damages, and all they could

10 do in going back to object to the confirmation is to say you

11 multiplied two times three incorrectly.  You added five plus six

12 incorrectly.  You made inappropriate calculations of damages.

13          I would also point, and your Honor, this is part of

14 the broader argument, that they could have even done that before

15 the referee.  They were invited to participate in the referee's

16 proceeding and they declined to do so.  So all they can do by

17 objecting to confirmation of the arbitration award is say the

18 calculations are wrong.  They can't challenge the liability or

19 entitlement to the default interest, and they haven't done it.

20  All they've done in their pleadings is to say we're not entitled

21 to it, already by determined by the state court.  They've never

22 said that the calculations are incorrect.  So there's nothing

23 about the confirmation of the referee's report that should change

24 this result, Judge.

1          MR. NASH:  Your Honor, that is not what a motion --

2          THE COURT:  And you see it differently?

3          MR. NASH:  Yes.  That's not what --

4          THE COURT:  But this is not an issue of fact.  This

5    is an issue of law.

6          MR. NASH:  Right.  That's not what a motion to confirm

7    is.  A motion to confirm is an important step in a foreclosure

8    process.  It's a calculation of the amounts owed, but then you

9    have to bring it to the Supreme Court to determine entitlements

10   to those calculated amounts, and it's very, very often in the

11   foreclosure practice that in the context of the motion to confirm,

12   which is an independent set of motions which precedes a judgment

13   of foreclosure, you deal with entitlement issues.

14          They never got to the motion to confirm.  There's no

15   confirmation that, A, there is an entitlement to default interest.

16    Nothing in this record indicates that.  They don't have a confirm

17   report.  Very often in practice the fight is not on the

18   calculation, but it's on entitlement, and the referee is what

19   he is.  He's a referee.  He does compute, but the entitlement

20   question is reserved for the court in the context of that motion.

21          THE COURT:  So this is a threshold issue for me to look

22   at --

23          MR. NASH:  Yes.

24          THE COURT:  -- before I do much else?

1          MR. RABINOWITZ:  It is a legal issue, your Honor, yes.

2    That's correct.

3          THE COURT:  A legal issue, and if I -- if for instance,

4    and if I ruled in favor of the lender, of the secured creditor,

5    which is the Greene Family, it's too long a name, if I ruled in

6    favor of them on either the fact that -- the same argument 213(b)?

7          MR. NASH:  You know, they put that in the sur-reply.

8          THE COURT:  All right.  So you're not ready for that.

9          MR. NASH:  It's 13(b).

10          THE COURT:  You're not ready to address to that.  Okay.

11    So but the point is is that if in fact this was something that

12    had been determined by summary judgment and was basically final,

13    I mean some of the -- again, it depends upon whether you're looking

14    at Rooker-Feldman or collateral estoppel or anything like that,

15    but then the question is going to be whether or not this was in

16    fact determined, and if it was determined, was it a final

17    determination?  And so that gets into the nitty-gritty of how

18    it works over there, and I can handle that I think.  So that I

19    think is a threshold issue.  Okay.  So all right.

20          Now it seems to me there's not a lot of point in doing

21    discovery on that until I determine this issue -- you doing

22    discovery I mean, or have you already?

23          MR. NASH:  No.  There have just been notices.

24          THE COURT:  Yes.  I mean I do think that that's

1  important that we -- that I determine that.  Okay. So that's an

2  issue of law.

3              You may proceed.  I'm sorry.

4              MR. NASH:  So you have that issue out there, and if

5  we were able to convince your Honor that because there's not one

6  single order in the record that establishes entitlement to a

7  default interest charge, it is my view that that is an open question

8  in Chapter 11 in the bankruptcy.

9              THE COURT:  Entitlement, when would it be too late,

10 final judgment of foreclosure?

11             MR. NASH:  Yes.  Final judgment I'm done.

12             THE COURT:  Okay.

13             MR. NASH:  That there's no doubt.  If there's a final

14 judgment of an amount I'm done.

15             THE COURT:  And so if I understand the Greene Family's

16 position is is that, you know, every -- all of this stuff was

17 determined by the judge, and now it's just a question of

18 calculations, and your view of the works is no, that until the

19 final judgment of foreclosure or some period before?

20             MR. NASH:  Final judgment of foreclosure.

21             THE COURT:  Until the final judgment of foreclosure

22 you would have opportunities to challenge entitlement?

23             MR. NASH:  Right, and you know, some would argue and

24 I've seen cases, well, if there was an actual order confirming

1  the report whether or not that would be Rooker-Feldman, because

2  it's not a judgment.

3          THE COURT:  Okay.  So maybe it's the order confirming

4  the referee report.  Maybe it's the final judgment.

5          MR. NASH:  But at this point it's just not there, and

6  what the summary judgment was about was not on the issue of default

7  interest and whether it was a valid declaration, but it was on

8  the issues of whether there was breach of representations under

9  the contract.  So the question of the amount of the claim is a

10  separate component that was never determined in the context of

11  summary judgment.

12          The context of summary judgment says they can proceed

13  with foreclosure because it wasn't a valid defense on the breach

14  of representations, but the real way you attack entitlements to

15  various charges, not just default interest because we're also

16  attacking late charges, and the flip side to that is you can't

17  have both as a matter of law.  You either can have default interest

18  or late charges, so that's wrapped up into this thing as well,

19  and there's no dual entitlement to that under several cases, and

20  it is our position that when we filed the objections that that

21  was going to be the front and center of what we were challenging

22  before your Honor, and that would essentially -- essentially

23  dictate how the plan would proceed.

24          As we develop the plan we have two alternatives.  We

have an alternative that I'm right and they're not entitled to default interest and I have a repayment schedule, and then I have another alternative.  I'm wrong.  They are entitled to default interest.

THE COURT:  And that's -- those are the schedules that you attached?

MR. NASH:  Right.  Those are the two amortization schedules.  So I think I can proceed whether it's on track one or track two on confirmation because either way I'm paying down a million dollars to bring it down to a level that I think is manageable, and I'm paying $100,000 a month, which will cover interest and amortization, and according to the schedules I think the outer limit is 66 months and the other one is shorter.

So that is something -- you know, I didn't close my eyes to the fact that I can lose.  I have two tracks, so I still think I should be able to proceed, you know, as we're determining the amount.

THE COURT:  Well, this all started because I asked whether you needed discovery.

MR. NASH:  Now, they think my plan is confirmable, and they filed an objection on the disclosure statement.  My view of these things is that those objections should be dealt with at confirmation, and all we're going to do is slow down the process of the disclosure statement.

1          THE COURT:  So let's do that first.  Let's do the

2    disclosure statement first.

3          MR. RABINOWITZ:  Your Honor, would it be appropriate

4    for me to present the objection given --

5          THE COURT:  Yes, yes, but just so -- let me tell you

6    where I'm coming from.

7          MR. RABINOWITZ:  Sure.

8          THE COURT:  Because I just -- just after you said this

9    in a chambers hearing yesterday, unless something is again

10   absolutely clearly entirely unconfirmable, and there are such

11   claims that come across my desk, so that it's a total of waste

12   of time for us to proceed, typically I will look at those kinds

13   of objections and say they're preserved for confirmation, and

14   again if something is entirely dead on arrival then I might just

15   say I'm not doing else.  Go have a sale, figure this out, give

16   me a new plan, go to the hallway.  I'm not convinced that that's

17   this case, but I also have I think some disclosure issues.

18         So let me hear your presentation.  Then I'll tell you

19   my thoughts, and then we'll have Mr. Nash do clean-up.

20         MR. RABINOWITZ:  Thank you, Judge.  Judge, is it

21   appropriate for me to speak from counsel table rather than the

22   podium?

23         THE COURT:  Either.  Wherever you're more comfortable,

24   as long as you have a microphone.

1          MR. NASH:  I can be seated until my turn.

2          MR. RABINOWITZ:  Well, the only reason is --

3          THE COURT:  As long as you have a microphone in -- you

4    have a -- you're probably safer with that big book over there.

5          MR. RABINOWITZ:  Yes.  That was my concern.  Sorry

6    that the book is big, but there's a fair amount of pleadings.

7          Judge, I recognize that to argue that this plan is

8    facially unconfirmable, and hence it would be a waste of judicial

9    resources to approve the disclosure statement and send it for

10   solicitation, is a high hurdle that I have to get past.  I

11   recognize that, but I believe that the totality of circumstances

12   in this case supports such a conclusion.

13         There is no dispute, as your Honor has pointed out,

14   that there is case law authority for the proposition that if at

15   the disclosure statement stage if a plan is facially or patently

16   unconfirmable, in the interest of judicial economy the disclosure

17   statement ought not be approved and should not be sent for

18   solicitation.

19         So it is my first argument that the totality of the

20   circumstances which I'm about to describe support that conclusion,

21   and then my second argument is if your Honor rejects that argument,

22   and I recognize the high hurdle that I have, that there is

23   inadequate disclosure here given the kinds of issues that this

24   plan raises.  So let me deal with the patent non-confirmability

first if I might, your Honor.

THE COURT:  Sure.

MR. RABINOWITZ:  The first is 1129(a)(10).  That is the plan as presently constituted can never satisfy the one impaired accepting class requirement of (a)(10), and if they can't satisfy the one impaired accepting class requirement of (a)(10), they -- on its face this plan is not confirmable.  Why is that the case?  They've identified three impaired accepting classes that could, if one of those classes voted yes, could satisfy the (a)(10) requirement.  The first is class one.  That is the secured claim of the Greene Family Interests.  The plan as presently proposed is unacceptable to the Greene Family.

So they have to look to the remaining two impaired classes that they have proffered as being the potential voting classes, and that's class three, former tenant security deposits of roughly $5,000, and that's class four, general unsecured creditors of approximately $31,000.

So what have they done to impair them?  Both of these classes are going to be paid in full, and the way the plan language reads up to within one year of the effective date of the plan, not upon the expiration of one year, but up to one year after the effective date of the plan.  So presumably their argument for impairment is that if they pay them the fifth day after the effective date with no interest that that's impairment, or if

they pay them six months after the effective date that's no
interest, or if they pay them nine months or a year without
interest, that's impairment.

The standard for artificial impairment is that it can't
be done to manipulate the vote, and there has to be some economic
purpose in the treatment in order not to be artificial impairment.
Here neither of those elements -- both those elements of the
test are in favor of the Greene Family or satisfied.  That is
there is no economic reason why these classes of creditors will
be paid up to one year from confirmation of the plan.  It's a
total of $35,000.  It's not going to make a material difference
stretching that small amount of debt over some period of time
over the next year, compared to as much as $10 million of debt
that the Greene Family claims they're owed that has to be adjusted
on the plan.

So there is no economic purpose to stretch them how
ever long they're going to stretch them.  We don't know how long,
but it could be as much as a year, and secondly, the only -- the
logical conclusion to be drawn from that is the only explanation
is is to create an impaired accepting class to satisfy (a)(10)
because those are the rationales for that treatment.  Both these
classes, three and four, are artificially impaired, and
artificially impaired classes cannot be utilized to satisfy
(a)(10).  If they can't satisfy (a)(10) on the face of it, they

1  can't confirm their plan.  That's the first argument.

2          The second argument is they're not satisfying (a)(8),

3  1129(a)(8), and the plan is not fair and equitable with regard

4  to the Greene treatment -- the Greene Family treatment under

5  1129(b)(2).  It's not fair and equitable because they propose

6  a one percent risk adjustment on the cram-down rate and a base

7  rate of 3.25 percent for a total risk adjusted rate of 4.25 percent,

8  and the risks in this case are significant.  They are significant

9  because this debtor generates no income.  The only way the plan

10  obligations are going to be satisfied is either by virtue of a

11  $1.8 million new value exception, which is insufficient to cover

12  all plan obligations by a large measure, and some amorphous

13  statement that the principals have made payments in the past,

14  so we conclude --

15          THE COURT:  I know you're using the totality of

16  circumstances here, but isn't this, unlike the first point you

17  made, isn't this sort of more within my -- well, for disclosure

18  purposes there's an easy way to deal with the disclosure issue,

19  but isn't this for purposes of when we get to confirmation sort

20  of within my discretion?

21          MR. RABINOWITZ:  Yes, your Honor, and I --

22          THE COURT:  So how do we --

23          MR. RABINOWITZ:  I will --

24          THE COURT:  How do we know today how I'm going to

1  exercise my discretion when we get to confirmation?

2         MR. RABINOWITZ:  I don't know that, your Honor, and

3  that's why I'm asking your Honor to look at the totality of

4  circumstances.  I will be the first to admit that the (a)(10)

5  argument is more of a legal argument that your Honor could rule

6  on today.  You may not, you may reject my argument.  I understand

7  all that, but it is a legal issue, but when you couple it with

8  the what I consider a disproportionately low risk adjusted

9  cram-down rate, and then you couple it with the significant (a)(11)

10 feasibility problems that this plan has, and you couple it with

11 the potential that if there is an impaired class of claims that

12 doesn't vote to accept the claims -- unsecured class of claims

13 that doesn't vote to accept the plan, that we have a LaSalle problem

14 with the equities being retained and not offering them, and lastly,

15 here's another what I believe to be straight --

16        THE COURT:  Well, you got -- but you got actually money

17 in this case coming in.  Maybe it's not enough money when you

18 think a million eight plus whatever -- the million eight include

19 what they -- the million eight is new or it's including what they've

20 already put in?

21        MR. RABINOWITZ:  It would be a new value.  New.  New

22 value.

23        THE COURT:  No, no, no.  But is it -- it's new, new?

24        MR. NASH:  It's new new.

1            MR. RABINOWITZ:  It would be new new.

2            THE COURT:  It's not what they've been putting in all

3    along --

4            MR. RABINOWITZ:  Right.

5            THE COURT:  -- during the 11?

6            MR. RABINOWITZ:  This is new.

7            MR. NASH:  We have new, and then we have new new.

8            THE COURT:  We have new new new, right.

9            MR. RABINOWITZ:  But your Honor, unless --

10           THE COURT:  Again, that's also discretion, you know,

11   how much is enough.  It's not nothing.

12           MR. RABINOWITZ:  I'm going to get to one last legal

13   issue, but I just want to make the point with regard to LaSalle,

14   while LaSalle doesn't tell us that the new value exception to

15   the absolute priority rule applies, it says if it applied here

16   is how we would have to treat it, and that is that equity would

17   have o be opened up, and equity is being retained by the existing

18   equity holder.

19           Here is the last legal issue.  We have a note and

20   mortgage that is drafted in such a way that the only way the lien

21   on the property gets released is if the mortgage debt is satisfied

22   in full.  That's essentially the way the document -- that's what

23   the parties bargained for, and what we have here is a plan which

24   proposes a release price.  I know why they want a release price,

1  but that materially alters the terms of the underlying note and

2  mortgage, and we have cited cases for the proposition that that

3  modification, that release of some portion of our lien for an

4  amorphous description of some release price, makes the plan

5  facially not fair and equitable to a secured creditor under

6  1129(b)(2).

7           So I think there are two straight legal issues, both

8  the inability to satisfy (a)(10) and the fact that by including

9  a release price in their plan as a matter of law it makes the

10 plan not fair and equitable to a secured creditor under (b)(2).

11  When you couple that with the significant feasibility issues

12 that exist here and the inordinately low risk adjusted cram-down

13 rate, I submit respectfully, your Honor, that on its face this

14 plan is patently non-confirmable, and as a result the disclosure

15 statement ought not be approved.

16          Having said that, on the adequacy of the information

17 itself, if your Honor is going to get to the stage of approving

18 the disclosure statement, there is no liquidation analysis at

19 all.

20          THE COURT:  Yes.  What about that?  Sorry to

21 interrupt.  Never mind.  We'll wait for you later.

22          MR. RABINOWITZ:  Okay.  There is insufficient

23 information as to feasibility.  Let's just spend a moment if I

24 can, your Honor.  I mean I've alluded to it, but I'd like to spend

1 just --

2        THE COURT:  Well, I think you're right about that.

3 I think you're right about that.  That's where I'm having a little

4 trouble too because I think in a project that is dependent upon

5 these approvals, critical, right?  Critical, and they've been

6 slow and they've been challenging and they've been difficult,

7 and I don't know that we really got the flavor of that from the

8 disclosure statement, and we don't have any real sense other than

9 somebody's hope.  Not even hope and a prayer.  Hope, or actually

10 very optimistic view of the world that, "Oh, from now on things

11 are going to be fine and we're going to be there by Spring," again

12 we thought we were going to be there already.

13        So I'm not sure that that has been fleshed out enough

14 and that the risks have been set forth enough, and it's not --

15 I understand you have a few creditors here, but it's important

16 because I think that a very similar kind of analysis has got to

17 be brought to bear with respect to the till analysis.  I mean

18 I don't -- I think they kind of have a relationship.  So even

19 if not for the benefit of creditors, for the benefit of the Court

20 it seems to me towards confirmation that -- and for the benefit

21 of creditors, but, and for the benefit of this creditor.  I mean

22 this secured creditor is entitled to a disclosure statement too.

23

24        It seems to me we all need a better understanding of

what the problems have been and what the problems may be,

understanding that everybody can pick this document up.  It's

a matter of public record, and there may be some stuff that none

of us think should be in there because you don't need to create

-- you don't need to give the other side and your locality and

your approvals all the reasons why you think they should be

objecting going forward.

So I mean there is a balance to be -- I'm not looking

for you to explode the future by saying all of the possible things

that they could find wrong, but I think there's a way to do it

so that at least we have a better understanding of the likelihood,

and understanding that there is that two-edged sword.  So I think

that with respect to -- so that's the point with respect to

localities, hat approvals are ahead of us and what the issues

are, and again, in a way that won't damage your position up there,

and then I guess the other point is whether or not everyone is

going to keep making the -- whatever the investments are between

now and the new new money, and then what happens if -- to these

folks if something happens so that the project becomes dead in

the water?

So I don't mean to put words in Mr. Rabinowitz's mouth,

but as I was reading it those are the kinds of things that I think,

in addition to a liquidation analysis, those are the kinds of

things that I think need to be fleshed out a little bit better,

1    but I'll let you continue.

2        MR. RABINOWITZ:  Your Honor, if I could just expand

3    upon your Honor's comments in two small respects in that regard?

4    First is that if in fact approvals are not obtained or approvals

5    are obtained and the development occurs, the $1.8 million of new

6    new money on its face is insufficient to cover plan obligations.

7    Simple fact of life, and there's no other source of income other

8    than --

9        THE COURT:  No.  Wait.  If the project is approved,

10   and maybe it needs to be stronger I thought it was -- I thought

11   it said in there if the project is improved it's whatever they're

12   putting in plus sale of the lots.

13       MR. RABINOWITZ:  Absolutely.

14       THE COURT:  Okay.

15       MR. RABINOWITZ:  But don't they have some obligation

16   to disclose some anticipated revenue as a result of sales of lots?

17   They say nothing.

18       THE COURT:  Well, I'm assuming that not only -- I'm

19   assuming that not only do they -- can they disclose that, I would

20   think that some of this information, and I'll ask Mr. Nash when

21   it's his turn, that some or a lot of this information would be

22   available or have been available by the experts who would have

23   been hired in order to present this stuff to the appropriate

24   planning board and zoning board, whatever else you have to do

1  up there in order to explain why this is such a terrific project,

2  and that whether it's part of the environmental impact statement.

3   I don't even what you had to do up there at this point, that

4  those kinds of -- you would have had to have some projections

5  about what it is that you're going to be planning and how it's

6  going to come about, so --

7          MR. RABINOWITZ:  So that is my point on that issue,

8  your Honor.

9          THE COURT:  That should be available, but we'll ask

10 him that.

11         MR. RABINOWITZ:  And the second issue is if in fact

12 monies have to come from existing equity, whether it's the 1.8

13 new new money or some additional amount over the 1.8 new new money

14 to cover plan obligations, are we entitled -- I believe we should

15 be, but I think creditors are entitled to know what the wherewithal

16 of the people putting that money in, because if the promise is

17 by equity, and I'm not suggesting this is the case, and all equity

18 is insolvent, then that contractual promise has no value, and

19 creditors ought to know about that.  They ought to know that if

20 somebody says there's a deficiency, a working capital deficiency

21 going forward, I'm going to fund it, the person who's promising

22 to fund it has the ability to fund it, and we don't know that

23 from --

24         THE COURT:  You have an issue on the 1.8?

1          MR. RABINOWITZ:  I have an issue on any money coming
2    in.
3          THE COURT:  Okay.
4          MR. RABINOWITZ:  All the disclosure statement says is
5    they can pay for it because they funded $3.2 million in the past.
6          THE COURT:  Right, and who wouldn't continue to put
7    money into a project when you've already put so much money in?
8          MR. RABINOWITZ:  But do they have the ability to do
9    so?
10         THE COURT:  Well, and also at some point if things look
11   like they're going south, sometimes people actually, although
12   they rarely seem to do it in my Court, they don't buy the idea
13   you should stop putting good money after bad, but at some point
14   if things go badly for the project people might decide there's
15   better place to put our money.
16         MR. RABINOWITZ:  And four small issues or four -- I
17   won't characterize them.  There's four additional issues.
18   Executory contracts are being assumed.  There is no
19   identification of cost to cure.  We don't know if there is any
20   that has a financial impact.
21         There is no analysis of the value or the disposition
22   of retaining causes of action.  The plan provides for retained
23   causes of action.  There is a requirement.  In all fairness, this
24   may not have been intended.  I don't know.  There is a requirement

1    to fund a disputed claims escrow, and I believe the way it reads,

2    "in the face value of the claim," and then if the claim objection

3    is resolved, the distribution occurs in the amount of the allowed

4    claim.

5            We are asserting a claim of $10,283,000.  The way the

6    plan reads is that upon the effective date of the plan they have

7    to fund a disputed claims escrow for any claim that is subject

8    to objection.  There is -- if that's truly what they intended

9    by the drafting of the plan, there is nothing in this disclosure

10   statement that says how that disputed claims escrow is going to

11   be funded, and the last issue is no disclosure --

12           THE COURT:  So you're saying that if your claim is under

13   objection they'd have to fund you to a hundred percent --

14           MR. RABINOWITZ:  That's what it says.

15           THE COURT:  -- in escrow.

16           MR. RABINOWITZ:  They probably intend that, but that's

17   what it says, and then disclosure as to compensation paid to

18   insiders.  So we've argued the plan is facially non-confirmable,

19   and the disclosure statement oughtn't be approved, and that there

20   are inadequacies in the disclosure.

21           THE COURT:  I have a funny feeling there's not a lot

22   of payments to insiders in this deal, but we'll find out.

23           MR. RABINOWITZ:  Thank you, Judge.

24           MR. NASH:  Let me take it one at a time.  I am not a

1  gerrymanderer.  Now, those cases from <u>LaSalle</u> are interesting

2  cases.  Those were cases where the mortgage was under water big

3  time, and they bifurcated the claim and they gave the undersecured

4  portion of the claim three cents on the dollar, and then they

5  had a class separate and apart from that, and they voted that

6  class to gerrymander the bifurcation and not pay the claim in

7  full.

8          That is not what I'm doing here.  A, the claims

9  classification is legitimate.  These are legitimate unsecured

10  claims.  If anything, I erred on the side of caution because I

11  -- there is a large claim here, the Boda (ph.) claim, which is

12  a former investor who never made his contributions, filed a million

13  dollar claim.  I deem that, because I wanted to take the high

14  road, I deem that as a non-voting class, but in reality that is

15  hardly an insider.  He's a former insider.

16          So there's -- if you want to look at it under a

17  microscope, I deemed it unimpaired, but they're really an impaired

18  claim, and so you have two or three classes of claims that are

19  valid impaired groups.  You can also call the taxing authorities

20  a potentially impaired claim, but I took the high road on that

21  because I wanted to get to the real essence of this.

22          I don't think the <u>LaSalle</u> case fits here because I'm

23  not bifurcating.  I don't think the gerrymandering rules of 20

24  years ago are at play any longer in this context, and I think

1  they've advanced, if anything.

2       THE COURT:  I don't think that was the argument.  I

3  don't think --

4       MR. NASH:  Well, he called me -- he says I'm artificial

5  impairment.

6       THE COURT:  Artificial impairment and improper

7  gerrymandering

8       MR. NASH:  Yes.  It's gerrymandering --

9       THE COURT:  -- is a little different.

10      MR. NASH:  -- because I'm -- yes, yes.

11      THE COURT:  Okay.

12      MR. NASH:  So I don't think that, you know, that's a

13 legal matter.  You know, they cite Judge Feller's case in

14 Washington Square or Washington Place.  That was a classic

15 bifurcation of the secured debt, and having an accepting class

16 to deal with that as a separate category.

17      THE COURT:  Okay.

18      MR. NASH:  I don't think I did that.

19      THE COURT:   Just so we're clear, LaSalle -- and LaSalle

20 is not the gerrymandering the case.  LaSalle is not the

21 gerrymandering case.  LaSalle is the case where --

22      MR. RABINOWITZ:  New value exception to the --

23      THE COURT:  Contribution of new equity.

24      MR. NASH:  Yes, but I'm responding to --

1          THE COURT:  You're on a different --

2          MR. NASH:  I'm responding --

3          THE COURT:  That's a different set of cases you're

4    talking about.

5          MR. NASH:  Right.  But I'm responding to the argument

6    of artificial impairment.  No.  Boston Post Road I think is the

7    case.

8          THE COURT:  Yes.  Boston Post Road is the one that said

9    you can't take the undersecured portion --

10          MR. NASH:  Right.

11          THE COURT:  -- and, right.

12          MR. NASH:  Now, the issue in, and I think I'm -- you

13    know, on LaSalle I think I'm -- of the many cases I've had this

14    is truly, truly new value in the classic sense of the word.  The

15    investors, the 11 investors have been at this now in a Chapter

16    11 for close to two years.  They poured in close to over $3 million.

17     They're current on every obligation that a bankruptcy court would

18    require.  They pay taxes.  They pay debt service.  They haven't

19    missed a payment.  They had a very extensive funding resolution

20    and financing motion before this Court, and yes, there's always

21    disclosure, and we can give financial disclosure, but the 11

22    gentlemen that form this group, some are richer than others, but

23    they're very, very, very, very sophisticated individuals.

24          THE COURT:  And remind me, when we did that back when

1 those people were disclosed at that time?

2          MR. NASH:  Yes.

3          THE COURT:  By name?

4          MR. NASH:  Yes, by name, by affiliation, by business.

5          THE COURT:  Right.  Okay.

6          MR. NASH:  And they do run a very clear way of raising

7 and contributing money, and not to use a baseball analogy, this

8 is truly a field of dreams.  If they build it there is no doubt

9 people will come, and that is one of the reasons why you have

10 the tension between the village of South Blooming Grove and the

11 development, because people will come.  What Blooming Grove is

12 afraid of is too many people will come, and it's not a question

13 of whether we can sell these homes.  The fight with Blooming Grove

14 has always been, "How many homes do you want to build?  You want

15 to build a thousand?  We'd sell a thousand."  They want us to

16 build less than a thousand.

17          So in terms of, you know, the financial wherewithal

18 of this project --

19          THE COURT:  And where's the paragraph that explains

20 -- that's a fair statement, but you know, it's not something we

21 just sort of --

22          MR. NASH:  No, and --

23          THE COURT:  So you might say this is an Orthodox

24 community --

1    MR. NASH:  Right.

2    THE COURT:  -- of a special, whatever, blah, blah, blah,

3  and people want to live here.  Maybe that paragraph explaining

4  why the demand would be so great --

5    MR. NASH:  Right.

6    THE COURT:  -- and I mean you already have them sold,

7  you already know who's coming in.  I mean again, without naming

8  names necessarily, there should be something that would explain

9  why -- you know, why we think that the problem is not -- part

10  of the problem could be contributions or the problem could be

11  approvals.  The problem is never going to be if we get to that

12  day the fact that we're not going to be able to sell.  Well, that's

13  obvious to you maybe because your clients shared and you understand

14  something about the community --

15    MR. NASH:  Right.

16    THE COURT:  -- that they're soliciting, but it's not

17  necessarily obvious to everybody else.

18    MR. NASH:  Well, and I will amend that.  I certainly

19  will amend that.  I will amend to put in additional details about

20  the financial wherewithal of many of the key members.  I will

21  amend that, and I will not rest on my laurels that I've been here

22  for two years, I put in X amount of money, and I've never missed

23  a payment, and I have a proven track record in this Court of living

24  up to my financial commitments.

1        I will go beyond that, but in theory and in practice,

2    Judge, the disclosure statement needs to confirm to the Bankruptcy

3    Code, but we also have to realize that this is an end run around.

4     If the issue is disclosure, I will make it, but if the issue

5    is legal viability of the plan, I will say to the Court that's

6    a confirmation issue.

7        THE COURT:  No.  And I, again except -- and I don't

8    think counsel -- counsel was saying that of the four points he

9    made, two and -- two of them and I think probably the first one

10   he's saying that -- he's talking about artificial impairment as

11   opposed to gerrymandering, say that you -- you know, you sort

12   of decided that you want to do it this way to just technically

13   create impairment as opposed to it being truly impaired.  That's

14   what I think he was arguing.

15       So but I -- let's go back to the other issue with respect

16   to, okay, as long as we're sitting here none of us are worried

17   that if it's approved it's going to sell, but you're going to

18   explain why.  We're not going to worry about that, but we're

19   convinced.  Let's assume we're convinced, and let's assume we're

20   convinced after you saw some financial wherewithal that people,

21   you know, are not going to -- people are going to keep putting

22   their money in, and what kind of commitment, by the way, do you

23   have on the million eight?

24       MR. NASH:  It's locked solid.

1          THE COURT:  What does that mean?

2          MR. NASH:  That means it's part of the funding of the

3 -- under the financing order.  That's the contributions that will

4 be paid.

5          THE COURT:  Okay.  So I mean they --

6          MR. NASH:  And that's -- but that's --

7          THE COURT:  The people have signed written commitments?

8          MR. NASH:  No.  It's going to be in my bank account

9 before we -- you know, that's not going to be something that I'm

10 going to be looking for.

11          THE COURT:  Right.  The million eight is going to be

12 sitting in your account before --

13          MR. NASH:  Right.  At a confirmation hearing.

14          THE COURT:  Before confirmation.  Okay.

15          MR. NASH:  So that's there.  Now --

16          THE COURT:  All right.  So now let's get to the other

17 part, which is how much to disclose without hurting yourself,

18 but without -- but enough so that -- and maybe some of this

19 disclosure can be made to the bank and maybe some of this disclosure

20 could be made by, again, by -- through confidentiality, under

21 seal or something if you don't want -- but I want a real assessment

22 as to what's going on with these approvals, and to go back a minute,

23 besides you writing some prose about the fact that the community

24 is going to want to buy into this and the demand is so great,

1  you have submitted projections of what this is going to look like,

2  right, to the various --

3          MR. NASH:  Yes.

4          THE COURT:  -- authorities?

5          MR. NASH:  But it's not finance.  It's more in the

6  nature of the total development.  The village up there, they're

7  not interested as much in how much those homes will sell for.

8  They're interested in how many people will be in those homes

9  because that creates, you know, a drain on services, roads,

10 schools, and the like.  So, and I don't want to minimize it.

11 If we told the village that the project would be half as to what

12 we're looking to accomplish, there would be less issue than what

13 it is now.  It's not the financial viability.  It's more technical

14 issues.  It's water issues.

15         One of the reasons why we slowed down a little bit is

16 there was -- there's water on the property, but they had to use

17 different wells, and so in the process isolating the new wells,

18 having the wells be tested by the engineers for the village takes

19 more time, and so we got a little bit delayed of several months

20 on this what we call the water issue.  Now, we know the --

21         THE COURT:  Potability.

22         MR. NASH:  Yes.  We know the water is there.  We know

23 it's going to -- it's sufficient water for what we're planning

24 to do, but it's a process.

1          THE COURT:  So these are already wells that are there?

2          MR. NASH:  Yes.

3          THE COURT:  You don't have to dig new wells, additional

4 wells?

5          MR. NASH:  I think there was some additional wells that

6 are part of it, but the water -- the bottom line is the water

7 is there and now it's got to be verified by the local engineers,

8 and it's going to be a little bit of a process, and we expect

9 to have that process take a little bit more time, but it doesn't

10 detract from the fact that we're moving forward.

11          THE COURT:  Your client wants to say something to you.

12          MR. NASH:  He wants to give me the technical aspects.

13          THE COURT:  Well, he can whisper it to you and then

14 you can tell us.

15                    (Pause in Proceedings)

16          MR. NASH:  Basically he's confirming what I've said.

17  The new wells have been dug.

18          THE COURT:  Okay.

19          MR. NASH:  But they have to be reviewed by --

20          THE COURT:  Tested.

21          MR. NASH:  And tested, and that's a process.  We have

22 to give them certain reports, and then those reports are analyzed

23 by engineers from the village, and then the engineers send out

24 their own consultants in the process.

1          THE COURT:  What would be if you in the -- from the

2    view of the debtor based upon the debtor's best judgment, and

3    you can put all the disclaimers you want in that the debtor is

4    not the approving authority, and blah, blah, blah, blah, and these

5    times may be greater, but from the debtor's realistic point of

6    view some kind of time line, again with milestones that talk about

7    the various approvals, again without hurting your position --

8          MR. NASH:  Right.

9          THE COURT:  -- with them as to what we're looking at.

10    Readjust it to what we obviously thought we were looking at eight

11    or nine months ago.

12          MR. NASH:  Right.  I could tell you off the tope of

13    my head it --

14          THE COURT:  Well, tell me in the disclosure statement.

15          MR. NASH:  Right, but I can put it in the disclosure

16    statement.

17          THE COURT:  All right.  Because I assume, and you can

18    say what approvals you've already obtained.

19          MR. NASH:  Right.  We've done a lot of work up there,

20    and but the water issue I think we've dealt with it, but I will

21    give all the details of that.

22          THE COURT:  Is the -- was this a case where you had

23    an environmental impact statement?

24          MR. NASH:  No.  We're not at that yet.

1           THE COURT:  Oh, you haven't done that?

2           MR. NASH:  No.

3           THE COURT:  Okay.  So a draft environmental impact

4 statement?

5           MR. NASH:  No.  We're not at that.  We got bogged down

6 over the water issue.

7           THE COURT:  Okay.  Look Mr. Nash, let me put on another

8 hat here.

9           MR. NASH:  Right.

10          THE COURT:  When I don't live here I have a place upstate

11 way farther north, so I understand how these things go.  You've

12 got -- this is -- you need to give us all a realistic time line

13 in this disclosure statement.

14          MR. NASH:  No.  I will do that.  I attached as an

15 exhibit --

16          THE COURT:  I mean if you don't -- if you're not even

17 at the draft environmental impact, do we have a lead agency?

18          MR. NASH:  Well, that's the -- there's been a

19 declaration of a lead agency, but they want to wait until the

20 water is issued.

21          THE COURT:  Who's the "they" in that sentence?

22          MR. NASH:  The Planning Commission.

23          THE COURT:  Is there a contest between various agencies

24 that want to be the agency?

1          MR. NASH:  Well, the delay -- see, everybody -- you

2    know, everybody knows that the lead agency designation is very

3    key, so they kind of, you know, I'll say it on the record.  They

4    kind of dragged their feet on that because that's an easy way

5    to drag your feet on that, and so they used the water issue as

6    an excuse to drag their feet on that, but we see that they're

7    -- and we tried to make nice on that issue.  We see that they're

8    dragging their feet a little bit too long.

9          THE COURT:  So you have planning professionals in this

10   case, right?

11         MR. NASH:  Yes.  We have two, yes.  This is not Kevin

12   Nash doing this.  We have -- not that I couldn't do it, Judge,

13   but --

14         THE COURT:  But --

15         MR. NASH:  -- this is not me.  There's --

16         THE COURT:  -- can you spend a few hours, use your

17   planning professionals and put a section into this disclosure

18   statement that states what has already occurred and what is ahead

19   of you with some idea of a time line.  You can even be optimistic.

20         MR. NASH:  Right.

21         THE COURT:  And you can put a disclaimer in that says

22   that this is the view of the debtor and the debtor's professionals,

23   but you know, all kinds of stuff happens.

24               MR. NASH:  Right.

1          THE COURT:  Whatever disclaimer you want, but you know,

2  right now we're all sitting here and we don't have any clue.

3  You have a clue, but the rest of us don't.  Maybe the Greene Trust

4  knows from whatever conversations you've had, as to how long this

5  is going to take.

6          MR. NASH:  No.  I will do that.

7          THE COURT:  All right.  And when are you supposed to

8  start making payments?

9          MR. NASH:  Excuse me?

10          THE COURT:  When are you supposed to start making

11  payments under the plan?

12          MR. NASH:  Well, under the original -- on the original

13  time frame --

14          THE COURT:  No.  Under the plan we're looking at today.

15          MR. NASH:  Right.  At confirmation, which we projected

16  to be early next year the effective date, we would start making

17  those --

18          THE COURT:  Effective date early next year?

19          MR. NASH:  Right.

20          THE COURT:  Okay.  Early next year.  We're now at the

21  beginning -- about to be the beginning of November.

22          MR. NASH:  Right.

23          THE COURT:  Early next year is a minute away.  So now

24  you're talking about if the 1.8 that's going to be used until

sales occur?

MR. NASH:  No.  The 1.8 is just for the plan.  We're going to still contribute to the project.

THE COURT:  No, no, no.  When you say the plan, the plan for the creditors.

MR. NASH:  Yes.  Is to pay down the mortgage a million and pay off the taxes and so forth.

THE COURT:  A million.  Okay.  So a million eight is going to be used up by their down payment and --

MR. NASH:  Taxes.

THE COURT:  Okay.  And so on the effective date they get their first payment?

MR. NASH:  Right.  A million bucks.

THE COURT:  No, no.  But when do they -- when is the next payment?

MR. RABINOWITZ:  Monthly payments of $100,000 a month.

MR. NASH:  100,000 thereafter.

MR. RABINOWITZ:  Thereafter.

THE COURT:  Okay.  And its the same 100,000.  It's just going to be longer if the default interest is there?

MR. NASH:  Right.

THE COURT:  Okay.  But it's going to be more than 100,000 if we create a bigger -- if the risk factor is more than one percent, right?

1          MR. NASH:  No.  It's still a hundred.  It's just a

2  longer payment.  The hundred covers principal, amortization, and

3  interest.  The $100,000 goes a long way a month.  That's a million

4  two a year.  So it's just -- it would just be a longer period

5  of time.

6          THE COURT:  But you figured out longer period of time

7  if you owe default rate of interest.

8          MR. NASH:  Right.

9          THE COURT:  And then a longer period of time even than

10  then if you have to pay a higher --

11          MR. NASH:  A higher risk payment.

12          THE COURT:  -- risk payment.

13          MR. NASH:  If the analysis of prime plus one is

14  unacceptable and it's a higher number, then we would have to either

15  adjust the payment or it would be a longer period of time.

16          THE COURT:  And why is it going to be -- is it -- and

17  do you have -- you don't have it accelerating when you start selling

18  houses?

19          MR. NASH:  Well, I do.  I have -- to me that's a benefit

20  to them, and they look at it as some type of terrible thing.

21  When I sell houses if the loan is still outstanding that means

22  when you sell a house I would have to get a partial release of

23  the mortgage for that particular lot.

24          THE COURT:  Right.

1          MR. NASH:  And so in the plan I left it to be negotiated,

2  but I'm going to give them a chunk of the proceeds to pay down

3  the mortgage in addition to the $100,000 a month.  So it's a good

4  thing to sell houses.  It's a good thing to give a partial release

5  because you're getting money quicker.  It's not a bad thing, and

6  a lot of these till plans get bogged down because they're just

7  balloon payments at the end.  They're interest only.  There's

8  no amortization.

9          This plan is a lot of amortization, and I think the

10  risk factor of prime plus one, which is really from the Supreme

11  Court, is really in the later cases they're using Treasuries now

12  with a risk factor.  I'm using a 3.25 risk factor base to start.

13  You know, Judge Drane's case was he would use a seven-year

14  Treasury rate.  So you know, the risk factor is something to

15  discuss and it's something to litigate, but whether it's a 4.25,

16  5.25, we can deal with that.

17          THE COURT:  That's also something to put in the

18  disclosure statement.

19          MR. NASH:  Yes.  I agree.

20          THE COURT:  Because it also goes to feasibility.

21          MR. NASH:  Right.  I will do that.

22          THE COURT:  Not just feasibility on the one or three

23  or four, whatever percent it's going to be, but feasibility on

24  whether or not this is ever going to get done, and if it's --

1  the longer this takes, the more money you're going to need from

2  your investors.

3         MR. NASH:  Right.  And I will deal with that, and

4  there's another point that I want to make that we haven't talked

5  about.

6         THE COURT:  All right.  So are you keeping track of

7  my issues?

8         MR. NASH:  Yes.  Yes.

9         THE COURT:  And which are their issues on disclosure?

10        MR. NASH:  Yes.

11        THE COURT:  Okay.

12        MR. NASH:  There's two guarantors on this.  Two

13  guarantors on the mortgage.  Two prominent members of the

14  community are guarantors, so this concept, and you know, it's

15  there, this concept that if the property bogs down these guys

16  are going to run for the hills, I'm going to disabuse everybody

17  of that notion.  We are not running for the hills.

18        THE COURT:  With your guarantee?

19        MR. NASH:  These guys' guarantees are better than mine,

20  but yes, so I will commit we're not running for the hills, and

21  I will emphasize the guarantee.  There's two guarantees here,

22  and so I will beef up the disclosure statement.  I got the sense,

23  maybe I was wrong, that we would go right to the main event and

24  use this in confirmation.

1          THE COURT:  No, no.  Two different issues.  What I'm

2    raising now I don't think are confirmation issues.  They're

3    disclosure issues.

4          MR. NASH:  Right.

5          THE COURT:  True disclosure issues.  They're not even

6    confirmation issues that I'm sort of raising, you know, you raise

7    as a practitioner early on confirmation issues because you want

8    to get things in the disclosure statement, you want to negotiate,

9    you want to get leverage.  I think these are real disclosure

10   issues.

11         MR. NASH:  Okay.

12         THE COURT:  This is not your typical situation.  As

13   much faith as you have in the financial wherewithal and the

14   dedication and the degree of passion and the money following the

15   passion that these individuals have in making this happen, much

16   of this, if not lots of this is out of their control, right?

17   And out of their control with different bodies that have not been

18   so user friendly, and whether or not it means that the scope of

19   the project is going to have to change in negotiations, obviously

20   you're not going to put in your disclosure statement that if things

21   get bad enough you're going to reduce the scope of your project.

22    You're not going to -- that would be stupid.

23         MR. NASH:  Right.

24         THE COURT:  Right?  That would be stupid, Mr.

1  Rabinowitz. It would be stupid for them to shoot themselves in

2  their foot in the disclosure statement with respect to the

3  authorities up there, but by the same token, you have to state

4  in a realistic way what the timetables are and what the obstacles

5  could be without undermining your position with the governmental

6  localities.

7         MR. NASH:  I'm prepared to do that within a few weeks

8  time.

9         THE COURT:  Can you sit and maybe work on some language?

10         MR. NASH:  I'm sure we could.

11         THE COURT:  Okay.  So we talked about -- all right.

12  I mean it is sort of -- how many -- what's the current scope of

13  the project?

14         MR. NASH:  600 homes.

15         THE COURT:  Is that where you started?

16         MR. NASH:  We kind of, you know, we started more, but

17  I think the -- I think it will be tolerable to the village at

18  600.

19         THE COURT:  So it's at 600 homes?

20         MR. NASH:  Right.

21         THE COURT:  Okay.  And did you -- you didn't put

22  anything in there about what you think these homes are going to

23  price at.

24         MR. NASH:  I don't think they need that level of detail,

1  but I certainly can put it in the disclosure statement.

2          THE COURT:  Well, do you have it?

3          MR. NASH:  Yes, we do.

4          THE COURT:  I mean I assume you have a lot --

5          MR. NASH:  Yes.  We --

6          THE COURT:  I mean I assume a lot of this information

7  they already have.  I'm not asking for things that you don't want

8  to share, but I'm assuming you presented it to them.

9          MR. NASH:  To the town?

10          THE COURT:  Yes.

11          MR. NASH:  And the village?

12          THE COURT:  Wouldn't this in some ways have -- this

13  is not -- these are homes.  This is not tax-exempt or --

14          MR. NASH:  No.  These are single-family homes.

15          THE COURT:  It's not exempt from real estate taxes?

16          MR. NASH:  No, no, no.

17          THE COURT:  Right.  So this is what you're going to

18  try to convince why they're going to increase their tax base.

19          MR. NASH:  It's going to increase their tax base.

20          THE COURT:  And I'm assuming you showed them that in

21  connection with how many --

22          MR. NASH:  Yes.

23          THE COURT:  -- properties and what they're going to

24  cost.

1          MR. NASH:  In fairness, that's not their issue.  Their

2    issue is not their tax base.

3          THE COURT:  I understand that's not their issue.

4          MR. NASH:  Right.

5          THE COURT:  But I think it's important for us to have

6    a sense as to what this is going to cost and how long it's going

7    to take from the time you have approval and how many you're going

8    to -- I mean in general -- in general or attach something that

9    indicates what the plan -- what the proposal is.

10          MR. NASH:  Right.  And if you --

11          THE COURT:  So we know for instance, assuming you get

12   approvals on a certain date that again you're going to have the

13   investors contributing, contributing, contributing until you

14   what; you have the first either deposit or you have the first

15   closing and how long is that going to be and how many are there

16   and how quickly are they going to happen, and how quickly are

17   they going to get built.

18          MR. NASH:  Right.

19          THE COURT:  Something like that.

20          MR. NASH:  Right.  And just to do rough math, at

21   $100,000 a lot, 600, that's $60 million.  So this project could

22   be a very strong project.

23          THE COURT:  Or it could --

24          MR. NASH:  But even the --

1          THE COURT:  Or somebody could kill it.

2          MR. NASH:  It's just a matter of time.  Yes.  When you

3    say "somebody could kill it," we, if we just show the ability

4    to stay the course, deal with the issues, and I think we've dealt

5    with this without litigation, just to do it internally and just

6    see it through and have the staying power, and that we're not

7    going to get frustrated.  We're going to have the staying power,

8    it's going to be built.  This is going to be built, whether it's

9    built next year, two years, or three years, it's going to be built,

10   and I will detail that in the disclosure statement.

11         THE COURT:  Okay.  And liquidation analysis, so I guess

12   it would be interesting for you to say what you valued the property

13   at as of the filing date.

14         MR. NASH:  Right.

15         THE COURT:  And what you value the property at as we

16   sit here today.

17         MR. NASH:  Right.

18         THE COURT:  And i guess that takes into account -- I

19   don't know if it takes into account where you are with anybody

20   or not, but whatever that would -- if you had to sell the property

21   today, what's the liquidation value?

22         MR. NASH:  Right.

23         THE COURT:  And obviously -- I mean you can say it,

24   but obviously the value of the property is going to go up once

1  the approvals are in.

2          MR. NASH:  Right.

3          THE COURT:  And it's going to continue to go up as the

4  buildings are built.

5          MR. NASH:  Right.

6          THE COURT:  So doesn't -- don't you really need to

7  negotiate with the lender with respect to what's going to happen

8  on the sales?

9          MR. NASH:  Yes.  You know, just because we're not

10 talking -- just because we're arguing that doesn't mean we're

11 not talking.

12          THE COURT:  Good.

13          MR. NASH:  So it's all about money, Judge.  This is

14 a Bankruptcy Court.

15          THE COURT:  I understand that.

16          MR. NASH:  It's all about money, so there's got to be

17 a middle ground there.  I thought we were a little farther along.

18  We got a counter-proposal, not to go into numbers that I --

19          THE COURT:  No.  Don't do that.

20          MR. NASH:  -- threw us for a loop, but we'll get back

21 to talking, and everything can be discussed.  Interest rates can

22 be discussed.

23          THE COURT:  Mr. Rabinowitz, the reason we're here now

24 is because when this stipulation was negotiated, everyone on that

side of the table believed that they'd be further along than they are now, and this would be a lot easier to do by way of plan and disclosure statement because again, the issue was if we could have confirmed -- if we had confirmed a plan and disclosure statement a long time ago, we have a feasibility issue, a feasibility issue is it going to get done, but by the same token it seems to me it is in -- it might be in your client's interest to see this through for a little bit longer.

I mean that's between you and your client, but what do we think the property would be worth if it was sold today as is, where is?

MR. RABINOWITZ:  Your Honor, the only indication of value that's a matter of record at this point in time is the number that the debtor has placed upon the value of the property as of the petition date.  I am not aware of any other efforts presently to value it, and if I state this wrong, Mr. Nash or Mr. Cooper, please correct me.  I believe that the value that's set forth on the schedules is $15 million is what the scheduled amount is. Beyond that, I'm not aware of any other indication of value. Judge, as to --

THE COURT:  I mean it's raw -- we're talking about raw acreage except that we have some wells?

MR. NASH:  It's raw acreage.

MR. RABINOWITZ:  It's an unimproved parcel of land,

approximately 860 acres.

THE COURT:  Unimproved parcel of land that has wells, some wells?

MR. RABINOWITZ:  Has wells, and there are --

THE COURT:  An unimproved parcel of land.  How many acres?

MR. RABINOWITZ:  860 acres.

MR. NASH:  Close to 900, yes.

MR. RABINOWITZ:  And there are areas of the land --

THE COURT:  I mean it's easy to figure out -- I mean it's easy to get an idea of what that is.

MR. NASH:  Right.

MR. RABINOWITZ:  Well, exactly, your Honor, and I believe that Mr. Nash has indicated that he's prepared to put that in the disclosure statement, that is how many units they expect to get out of this and what they expect the --

THE COURT:  No, no.  That's not liquidation analysis.

MR. NASH:  No.  That's if you wanted to sell the weeds right now.

MR. RABINOWITZ:  I -- liquidation analysis, I think he has an obligation to disclose, but what I'm suggesting, your Honor, with regard to the feasibility kinds of issues I assume, and it's very dangerous to assume as we all know, that they know -- they're saying 600 units and they have some sense of what the

1  sales price of the lots would be.  With whatever appropriate

2  disclaimers they need, I think that needs to be set forth in the

3  disclosure statement because, Judge, there is undevelopable land

4  here.  There is portions of this 860 acres which is never going

5  to be developed, and that gets to the release price.

6          What Mr. Nash put in, and I understand why he did it.

7   Let me take a step back.

8          THE COURT:  They're never going to be developed because

9  they're --

10         MR. NASH:  Well, you got to keep green space.  You got

11  to -- yes.  You have to keep --

12         THE COURT:  What's the -- I just went blank.  I just

13  had -- I'm having a senior moment.  Water, water.  What do you

14  call --

15         MR. RABINOWITZ:  Wetlands.

16         THE COURT:  Thank you.

17         MR. RABINOWITZ:  Because there are wetlands on the

18  property.

19         THE COURT:  I could not come up with that word, and

20  I used to do a lot of this stuff, so that was scary.  Okay.

21  Wetlands.

22         MR. RABINOWITZ:  Yes.

23         THE COURT:  Yes.

24         MR. RABINOWITZ:  So I just want to, before I address

1 a few small issues, it sounds like we are in the process of working

2 through.

3         THE COURT:  Maybe there's not wetlands.  Go ahead.

4         MR. RABINOWITZ:  We have engaged in settlement

5 negotiations.

6         THE COURT:  What's that?

7         MR. RABINOWITZ:  While this argument with regards to

8 the disclosure statement and the allowed amount of our secured

9 claim, notwithstanding those arguments, the parties have engaged

10 --

11         THE COURT:  Well, I assume, because you're good

12 attorneys.  You wouldn't be doing otherwise.

13         MR. RABINOWITZ:  And I just want to go on the record

14 saying that we are still prepared to engage in settlement

15 discussions, so that at any time in any environment we're prepared

16 to engage in that dialogue with Mr. Nash.  So having said that,

17 I want to go back to the release price for a second.

18         In development projects at the point of origination

19 of a loan some loan documentation contains a release price, but

20 in my experience when there's a release price it says -- it sets

21 minimums for what you can sell the units for and it agrees to

22 what portion of the proceeds will be paid over to the lender in

23 exchange for the release, and the reason for that is that if you

24 sell the property too low or if you keep too much of the proceeds

and pay too little to the lender, the lender's giving up collateral and not getting equivalent value in exchange for giving up that collateral.  So the minimum sales price and the percentage of proceeds that have to be turned over --

THE COURT:  But it could be done by percentage.

MR. RABINOWITZ:  It can be done by percentage.

THE COURT:  Without knowing exactly what your -- I mean a percentage of whatever the price is it sells for.

MR. RABINOWITZ:  You could do it by percentage, but the point is this plan says none of that.  It simply says that when we sell you're going to release your lien.  Now why is that a problem, among other things?  There are problems of administration with regard to release prices, but in good faith, good-faith parties can work through those issues.  I acknowledge that, but there's also this problem.  If you sell all the developable lots and you pay over some percentage and you're left with a portion of the debt and land that can't be developed, you've diminished the value of the collateral and kept an outstanding balance, and if that's disproportionate that's unfair to the lender.  The lender retains stuff and liquidation has no value because there might be wetlands or they had to be kept as open space, whatever the reasons are.  So the --

THE COURT:  Right.  So you're saying you don't take the 900 acres and just divide it by acre --

1           MR. RABINOWITZ:  Right.  Exactly.

2           THE COURT:  -- and figure it out that way.  You would

3 do it by --

4           MR. NASH:  By home.

5           THE COURT:  I assume you would do it by home.

6           MR. RABINOWITZ:  Yes.  So --

7           THE COURT:  In which case maybe you get the upside of

8 that.

9           MR. NASH:  Right.

10          MR. RABINOWITZ:  Understood.

11          MR. NASH:  It's all good for you.

12          MR. RABINOWITZ:  So the reason a dialogue -- a

13 meaningful, substantive dialogue that would need to be engaged

14 in to convince my client to agree to a release price, including

15 --

16          THE COURT:  Don't they have to agree?  I can't make

17 them do that in a plan.

18          MR. RABINOWITZ:  Yes.

19          MR. NASH:  Okay.

20          THE COURT:  Right?  That can't be part of cram-down,

21 can it?

22          MR. NASH:  With all due respect to counsel, I said do

23 you want to sit down and negotiate the plan?

24          THE COURT:  Okay.  We all agree that it's not part of

1  cram-down?  I don't see that in 1129.

2         MR. RABINOWITZ:  I agree.  We have cited two cases that

3  your Honor cannot compel as part of 1129(b)(2) cram-down a release

4  price if it doesn't previously exist in loan documents.  It would

5  have to be through negotiation.

6         MR. NASH:  Okay.

7         MR. RABINOWITZ:  And so my only point is --

8         THE COURT:  And, and absent that negotiation don't you

9  have a feasibility issue or at least a disclosure issue that says

10  if they're never going to release it, you're never going to be

11  able to pass title, which means you're never going to sell a unit,

12  which means that they're going to -- investors are going to have

13  to pay off the loan?

14         MR. NASH:  Pony up more money.  That's all it means,

15  Judge.

16         THE COURT:  Well, no, no, or it means somebody throws

17  their hands up.

18         MR. NASH:  No.  If I have a hundred contracts of sale

19  and a release price then my investors have a hundred contracts

20  of sale --

21         THE COURT:  I mean there is, is there not -- isn't there

22  an implied requirement of good faith?  So I assume that if you

23  refuse they could bring you to court.

24         MR. RABINOWITZ:  Yes.  Well, I'm -- if your Honor's

suggesting that I am not prepared, I can speculate for a moment

that under applicable non-bankruptcy law that a debtor could

compel a partial satisfaction of mortgage in exchange for selling

and paying down.  I don't know.  I suspect not under New York

law, but I don't know the answer to that.

THE COURT:  Well, it depends on whether you're

operating in good faith or not, but I don't know sitting here.

MR. RABINOWITZ:  Okay.

THE COURT:  Just off the top of my head.

MR. RABINOWITZ:  But Judge, if I can just point out

a couple things based on what Mr. Nash has aid.  I think with

regard to the wherewithal issue, feasibility, whatever you want

to characterize it as, that both with regard to the Equities'

ability to fund, whether they have the money is important because

he's made several statements they're not going to walk away from

this project, then I think we need to know what their ability

is to fund this project, and the build-out, that if he thinks

there's 600 lots, what is an estimated sales price?

Because here's what he said.  A million eight is going

to come in new new money to satisfy the new value.

THE COURT:  Well, a million is going to you.

MR. RABINOWITZ:  And $800,000 is going to go to other

-- there's $300,000 of taxes and --

THE COURT:  Right.

1          MR. RABINOWITZ:  So let's assume there's at least

2  $400,000 of the million eight left over.  That funds four months

3  of debt service.

4          THE COURT:  Four months.

5          MR. RABINOWITZ:  That's all it funds.

6          THE COURT:  I understand.  I got that.  I told him he

7  needs to disclose that.  That's why he needs to disclose how far

8  folks are willing to go.  I mean if you're not cooperating and

9  the locality's not cooperating, there's just so much I think

10  anybody, any intelligent person is going to pour into something.

11          MR. RABINOWITZ:  And the last point, just for the

12  record, Mr. --

13          MR. NASH:  Except when you pass the point of no return,

14  which we have.

15          MR. RABINOWITZ:  The last point is Mr. Nash has made

16  a point presumably to demonstrate some broader sense of adequate

17  protection or minimization of risks that there are guarantees

18  out here by two of the principals.  What the record doesn't reflect

19  is those are not absolute unconditional guarantees.  They are

20  limited guarantees, and as I read them, limited to loss.

21          MR. NASH:  $5 million.

22          MR. RABINOWITZ:  Limited to loss.  So they aren't full

23  absolute.  So that's the only additional point, I wanted to make,

24  your Honor.

1          THE COURT:  Okay.  I just want to understand the --

2     I want to find the stipulation.

3          MR. NASH:  It's dated --

4          THE COURT:  No.  I just have to find it on the docket.

5          MR. NASH:  -- November 24th.

6          THE COURT:  Docket 82, December 23rd?

7          MR. NASH:  Yes.  You signed it December 23rd.

8                    (Pause in Proceedings)

9          THE COURT:  All right.  So basically from this point

10    forward the idea is to be on track for confirmation within a

11    reasonable period of time, but in no event not later than December

12    31 unless my schedule and availability are otherwise.  Right?

13         MR. NASH:  Right.

14         THE COURT:  That's pretty much -- okay.  I just didn't

15    know if you had specific requirements.

16         MR. NASH:  Those were -- we obviously recognize that

17    there's going to be issues with availability and amendments and

18    so forth, and there's a provision in there in paragraph 6 that

19    it can be extended for cause if we need additional time for whatever

20    reason, and the plan was filed with consent I believe on September

21    18th instead of the 15th which --

22         THE COURT:  Okay.  I don't want to --

23         MR. NASH:  -- I think was a holiday.

24         THE COURT:  I don't want to rule from the bench on the

1  objections today.  I want to give you on the disclosure statement

2  an adjourn date.  I want you to take a crack with the other side

3  or on your own first and then with the other side with your

4  amendments, and then I want to see it and then I want to have

5  you back, at which point I'll rule on the issue of, you know,

6  is this plan dead on arrival.  I don't think it's dead enough

7  for me not to have you amend it, if that makes any sense.

8          MR. NASH:  Okay.

9          THE COURT:  Okay.  I do want to take a look at the issue

10 of artificial impairment, and not that -- this has no persuasive

11 value to me one way or the other.  I haven't even completed my

12 reading on it, but I think isn't the -- the commission wants to

13 get rid of that requirement, right, of an impaired acceptance?

14  I think so.  It doesn't matter.  It's not -- I didn't even read

15 their report, but I think that's the case.

16          MR. RABINOWITZ:  I believe that was mentioned at one

17 of the --

18          THE COURT:  I think so.

19          MR. RABINOWITZ:  -- ABI sessions.

20          MR. NASH:  The Ninth Circuit got rid of it.  The Ninth

21 Circuit got rid of it.

22          THE COURT:  I know.  I think that's one of their --

23 but I'm not ruling on the commission.  I have to rule with the

24 current statute.

1    All right.  How long are you going to take to do this?
2  Because the other thing I will do --

3    MR. NASH:  It depends if the Mets in four, five.  If
4  they go seven, I'll be too nervous to -- I'll have it done in
5  -- we're going to talk, two to three weeks.

6    THE COURT:  My son is a huge Mets fan.  He lives in
7  Washington, D.C. now.  He's about to get -- I mean I haven't kept
8  it a secret.  I'm going to be away for a week.  He's about to
9  get married, and they bought a condo that was way, way too expensive
10 I thought.  I mean as a good mother I sent them a Schedule I and
11 Schedule J, and said, "You better fill this out before you do
12 that," but in any event, so one of the things that they did to
13 save money is they get rid of all of their cable, so there's no
14 television in the apartment.

15    MR. NASH:  But they watch on the internet.

16    THE COURT:  Yeah.  I called him screaming last night
17 in the first inning, and I said, "But you don't have a television.
18  I'll get you cable for this."  He says, "No, no, no.  I'll follow
19 it on the internet."  So anyway, some people can't even --

20    MR. NASH:  I hope his wife is a Mets fan because there's
21 a very cute movie, "Diner," when they got married and he was a
22 big Baltimore Colt fan and she had to give -- they went through
23 the big quiz, and if she didn't pass the quiz he wasn't going
24 to go ahead with the marriage.

1          THE COURT:  I don't even -- her brother is a Yankees

2     fan.  I don't know.  Maybe I could use that in a speech.

3          MR. NASH:  Okay.

4          THE COURT:  How long you going to take?

5          MR. NASH:  Three weeks.  We'll talk this week.

6          THE COURT:  Okay.

7          MR. NASH:  Mid November.

8          THE COURT:  All right.  So what if we came back --

9     because the other thing I want to do is I want to take a look

10    at -- I want to -- for purposes of the objection to claim, I want

11    to take a look at what we discussed earlier as the threshold issue

12    as to whether or not the issues that one could argue would still

13    be open and subject to discovery in a contested matter.

14          So basically your objection to claim is with respect

15    to that and late charges?

16          MR. NASH:  Yes.

17          THE COURT:  Okay.

18          MR. RABINOWITZ:  Your Honor, there is also a

19    post-petition component.  Presumably Mr. Nash's position is, and

20    I'm sorry to --

21          THE COURT:  He indicated I think --

22          MR. NASH:  Yes.

23          MR. RABINOWITZ:  Both pre and post-petition.

24          THE COURT:  Okay.  Because the stipulation talked

1 about your paying adequate protection on the non-default rate.

2          MR. NASH:  Non-default, yes.  I mean --

3          THE COURT:  And that the difference would be the

4 difference?

5          MR. RABINOWITZ:  The difference would be the

6 difference.  That's correct.

7          MR. NASH:  Except, you know, I think they stipulated

8 that the non-default rate will control, but we'll deal with that

9 in another context.

10          MR. RABINOWITZ:  Yes.  There are -- the only point I

11 would make, your Honor, recognizing that most if not at all of

12 these issues have been briefed, and I know that your Honor has

13 reviewed the briefs, I like to believe that oral argument has

14 some value, and if your Honor is going to address the objection

15 to claim, I would like an opportunity to in a fuller fashion --

16          THE COURT:  No, no, no.  I'm just going to address --

17 hold on.  Let's see how far we can continue here, but I was just

18 going to address when we come back I'd take a look at what I thought

19 was the threshold issue.

20          MR. NASH:  Right.

21          MR. RABINOWITZ:  Okay, okay.

22          THE COURT:  Not rule on --

23          MR. RABINOWITZ:  And the threshold issue being whether

24 discovery is necessary, this can be decided as a matter of law?

1          MR. NASH:  No.  Whether I'm precluded in the state

2     court by virtue of --

3          THE COURT:  Well again, that would be whether discovery

4     would have any point.

5          MR. NASH:  Right.

6          THE COURT:  That's the threshold issue.

7          MR. RABINOWITZ:  Well --

8          THE COURT:  But then again, you want oral argument on

9     the objection to claim.  That's fine.  I'm not inclined to send

10    it back.

11         MR. RABINOWITZ:  Okay.  Understood, your Honor, but

12    on the threshold issue Mr. Nash has made a bit of a presentation.

13     I haven't --

14         THE COURT:  Oh, I'll let you.  No, no.  I'll let you.

15         MR. RABINOWITZ:  Okay.

16         THE COURT:  No problem.  Let's just figure out when

17    you're coming back.

18         Oh, I can ask you.  We're not doing -- we have -- on

19    December 3rd, the date for the evidentiary hearing, this is not

20    -- that's on the claims objection.  That's going to mediation?

21         MR. NASH:  Yes.  Oh, that's with the O'Neal (ph.)?

22         THE COURT:  Right.  Everything else is before -- is

23    submitted, right?

24         MR. NASH:  Right.

1              THE COURT:  Is everything else submitted?

2              MR. NASH:  I hope so.  I don't want to write any more

3  papers.

4              THE COURT:  Well, December -- I have December 3rd.

5              THE CLERK:  That's right.  We can put them on in the

6  afternoon.  I just -- my question was, was everything --

7              THE COURT:  Well, that's what I have to -- I just asked

8  him that, but I --

9              THE CLERK:  We can put them on.

10             THE COURT:  Okay.  The afternoon of December 3rd.

11 That will put us into January on confirmation probably, but that's

12 really a function of holidays and my schedule.

13             MR. NASH:  Thank you, your Honor.

14             THE CLERK:  2:30, Judge?

15             THE COURT:  I think it may be the first -- is it the

16 first Hanukkah?

17             MR. NASH:  It's around there.

18             THE COURT:  Oh, not until the 6th.  All right.  We're

19 good.  We're good on the third.  Is it good?

20             MR. NASH:  Yes.  The 3rd.

21             THE COURT:  Oh, I thought you were still looking.

22             MR. NASH:  No.  I'm looking at --

23             THE COURT:  All right.  So okay, December 3rd at 2:30

24 for everything, and do you have anything more you want to argue

1 before Mr. Rabinowitz has the floor?

2          MR. NASH:  No, but I'd like to have an opportunity to

3 respond.

4          THE COURT:  All right.  When do we start the afternoon?

5          THE CLERK:  1:30.

6          THE COURT:  Okay.  All right.  About how long?

7          MR. RABINOWITZ:  About 15 minutes.  Is that okay, or

8 is that a problem?

9          THE COURT:  No.  It's not going to be a problem.  I

10 just want to figure out if I want to -- I don't want to keep --

11 they're all on the phone?

12          THE CLERK:  Yes.

13          THE COURT:  I got a lot of legal expense on the phone.

14  Can I -- could we break for 15 minutes?

15          MR. RABINOWITZ:  Sure.

16          THE COURT:  Okay.

17          MR. RABINOWITZ:  Thank you, Judge.

18          THE COURT:  All right.  We're going to put second --

19 leave everything.  We're doing this on the phone.  Second call.

20          MR. RABINOWITZ:  Thank you, Judge.

21               (Off the record/On the record)

22          THE CLERK:  Second call in the case of Keen Equities,

23 LLC, matters 6 through 9.

24          THE COURT:  Mr. Rabinowitz.

1        MR. RABINOWITZ:  Good afternoon, your Honor.  Your

2    Honor, we've had a lot of exchange on the record, so I'm not going

3    to -- I'm going to make every effort not to duplicate things that

4    have been said.

5        I thought initially it would important just to give

6    your Honor a sense of what the difference in economics is here.

7    The debtor's possession is that we have a pre-petition claim

8    of $5 million, that we have no post-petition claim because the

9    adequate protection payments, the 362(d)(3) payments satisfies

10   any post-petition debt service requirement.

11       We believe in analyzing the debtor's position, that

12   it's really five seven rather than five, given the legal positions

13   they've taken in their papers, and the Greene family believes

14   that its secured claim is $10.3 million, including a substantial

15   amount of post-petition default interest.  So that's the range

16   of economics that the parties are litigating about.

17       The Greene family's arguments fall into four

18   categories, two of which I believe your Honor is indicating you'll

19   address at the adjourned hearing, and two which I think go to

20   the threshold, but let me identify the four categories to make

21   sure that I understand how we are bifurcating the issues this

22   afternoon.

23       The first category of arguments the Greene family is

24   that the issues have already been determined, whatever you want

to call it, Rooker-Feldman, collateral estoppel, res judicata,
law of the case, what ever you call it the issues at least with
regard to the pre-petition claim have been determined.

The second argument is if it hasn't been determined,
the debtor has waived it, and again that goes to the pre-petition
claim, and then the third category is if there isn't an issue
of preclusion and there isn't waiver, then as a matter of fact
and law we're entitled to it, and lastly, at least with regard
to the pre-petition claim if your Honor rejects all that, your
Honor can vacate the stay and allow the referee's report to be
confirmed, resolving the pre-petition claim or any arguments with
regard to the pre-petition claim.

As I understand it, the third and the fourth arguments
--

THE COURT:  Wait.  Do I understand that to mean that
if I don't buy any of your arguments, I should go somewhere else
where they might or --

MR. RABINOWITZ:  I simply mean that if your Honor, there
is cause and I was going to -- I wasn't going to address that
this afternoon because I thought that would have -- the issue
of vacating the stay, I understand your Honor made a comment with
regard to it.

THE COURT:  Right.

MR. RABINOWITZ:  But my point is that -- I wasn't going

to argue that today because I thought your Honor wanted me to

address the first two arguments.

THE COURT:  Yes.  Yes.

MR. RABINOWITZ:  That is the threshold arguments.

THE COURT:  I was --

MR. RABINOWITZ:  I'm going to preserve my rights with

regard to that.

THE COURT:  I try to keep my sense of humor even on

a difficult afternoon.

MR. RABINOWITZ:  Understood, your Honor, and it's

important and it's very difficult to do, to maintain perspective

and keep a sense of humor.

So let me deal with the first two arguments.  It's

already been determined, or if it hasn't already been determined,

it's been waived.  With respect to already been determined, we

rely upon four documents; Rooker-Feldman, who says this Court

doesn't have jurisdiction because it's already been determined

by the state court; res judicata, collateral estoppel, and law

of the case.

The debtor says none of that matters because we can

always raise all these issues including the waiver by objecting

to confirmation of the referee's report, and we believe that that

fails to recognize the distinction in that position that we've

attempted to make in our papers, and that is that all the debtor

1  objects to is our entitlement to default rate interest

2  essentially.  That's the major issue here, and we believe that

3  that was determined by the state court judge, not the referee,

4  and all the state court judge did was to make an order of reference

5  to the referee that says, "Given what I have determined, you

6  calculate what those amounts were," and if you look at the order

7  of reference and you look at the case law that we've cited, the

8  referee can do no more than the order of reference says that the

9  referee is supposed to do, and what the order of reference here

10 says is, "You've got to calculate the damages.  I've made the

11 determination of liability.  You've got to calculate the

12 damages."

13          So if that's true, and that's the position we think

14 is supported by the facts and the law, when the debtor says they

15 can always go back to the state court judge and raise the liability

16 issue as part of an objection to confirmation, we respectfully

17 submit they cannot.  All they can say in objecting to the

18 confirmation of the referee's report is, "He did it wrong," and

19 we've also cited a case, a state court case called Acevedo that

20 stands for the proposition that what the state court judge did

21 in addition to res judicata, Rooker-Feldman, and collateral

22 estoppel is law of the case, and that great deference to the HCB

23 case that we cited should be given to what the referee did with

24 regard to the calculation of damages if not applying some issue

of preclusion doctrine to the referee's findings as well.

Now, the debtor says well, the issue was never raise before the state court, and respectfully I don't believe that's true.  On page seven of our supplemental brief we cite to the relevant paragraphs of the foreclosure complaint, paragraph 16, paragraph 17, and paragraph 26, and paragraph 16 says that there was a failure to pay the principal and interest as of October 1.  Paragraph 17 starts, "By reason of the default the plaintiffs have elected and hereby elect to accelerate, and they're entitled to interest including 18 percent per annum which is the default rate under the note," and paragraph 26 says, "Pursuant to the terms  and provisions of paragraph 16 the plaintiffs are entitled to this foreclosure action commenced as the consequence of an event of default by Keen under the note and the mortgage."

So the issue of an event of default, the issue of acceleration, the issue of the entitlement to default rate interest were all pled in those particular paragraphs of the foreclosure complaint, and the summary judgment order granted summary judgment on those allegations.  So that issue has been determined, and it has been determined sufficiently to allow either Rooker-Feldman or the issue preclusion doctrines that we have cited to apply, and again I go back to Acevedo.  In Acevedo a similar kind of issue was raised.  There was entry of default judgment, and there was no express finding in the order authorizing

1  the entry or the judgment of default and acceleration and issues

2  of that ilk, but the court held that since they were pled, it

3  was assumed or presumed that the state court had ruled on that

4  by granting default judgment.

5          Here we have a context which has greater due process

6  attributes associated with it than default judgment because there

7  was an answer.  There was an opposition to summary judgment.

8  There was a consideration of all those things resulting in the

9  entry of summary judgment where the entitlement to those issues

10 were pled.

11         So we believe that what we're arguing is not necessarily

12 that the referee's report is issue preclusive or provides for

13 a determination to which Rooker-Feldman applies, but it is the

14 state court's summary judgment order which found the entitlement,

15 and all the debtor objects to in any of these papers that constitute

16 a fair portion of this book, all the debtor objects to is the

17 entitlement issue, not to the calculation that occurred by the

18 referee.

19         So I'm not going to go into all the elements of

20 Rooker-Feldman.  I would point out that Rooker-Feldman, I know

21 your Honor has written decisions under Rooker-Feldman.

22         THE COURT:  Oh, yeah.  Comes up every day.

23         MR. RABINOWITZ:  And it doesn't require finality.  It

24 doesn't require finality in the sense that the debtor would have

1  it; that is an order that is -- or a judgment that is final and

2  appealable as a right, doesn't require that.  Collateral estoppel

3  doesn't require finality, and collateral estoppel applies to

4  quasi-judicial proceedings.  The law of the case obviously

5  doesn't' require finality.

6          Res judicata does require finality.  I acknowledge

7  that, but it's not the kind of finality that the debtor alleges

8  applies to res judicata.  The debtor says there's been no final

9  judgment of foreclosure that we have a right to appeal as a matter

10  of right, and I respectfully submit we've cited the DEF Investments

11  case, Bankruptcy Court from the District of Minnesota, 1995, for

12  the proposition that res judicata is a more flexible doctrine,

13  and while it requires a complete decision on the issues in

14  question, it doesn't require that that order be appealable as

15  a right, and we cite that case because there's language -- I mean

16  it says, "For the purposes of preclusion, therefore, a final

17  judgment includes any prior adjudication of an issue in another

18  action that is determined to be sufficiently final to be accorded

19  conclusive effect, not necessarily final so as to be appealable

20  as of right."

21          So the argument the debtor makes is, "Well, we can always

22  -- there's no final judgment.  We can -- until there's a final

23  judgment we can  appeal.  There's no finality for purposes of

24  res judicata," I respectfully submit is not consistent with the

law, and I know that your Honor in addition to writing decisions

on Rooker-Feldman in the, and if I pronounce the case incorrectly,

the Chaitan case, am I pronouncing that?  C H A I T A N.

THE COURT:  I think it's Chaitan.

MR. RABINOWITZ:  Chaitan, which is also your Honor's

decision.

THE COURT:  I could have gotten it wrong.

MR. RABINOWITZ:  I think has helpful language in it

with regard to res judicata.  Your Honor stated that, "Res

judicata prohibits re-litigating claims that could or should have

been litigated in a prior proceeding.  New York State courts apply

res judicata apply liberally, taking a transactional approach

such that once a claim is brought to a final conclusion all other

claims arising out of the same transaction or series of

transactions are barred, even if based upon different theories

or seeking different remedies."

So issue of Rooker-Feldman, this Court doesn't have

jurisdiction, issue of preclusion in terms of res judicata,

collateral estoppel, and law of the case, and in the alternative

if your Honor says, "Rabinowitz, I don't buy your argument" --

THE COURT:  I just recently wrote about law of the case

too, but --

MR. RABINOWITZ:  Okay.  And I apologize that I did not

cite that opinion, your Honor, but if your Honor says, "Rabinowitz,

I don't accept your arguments on Rooker-Feldman or res judicata
--

THE COURT:  Maybe not.

MR. RABINOWITZ:  Okay.  They've waived it.  Let's talk about what happened here.

THE COURT:  I in fact wrote about law of the case recently.  Go ahead.

MR. RABINOWITZ:  Waiver is relinquishment of a known right.  They had an opportunity to raise the absence of notice of default in their answer to the foreclosure complaint.  They did not.  The had an opportunity to raise the absence of notice of default and acceleration in response to the summary judgment motion.  They did not.  They had an opportunity to raise it before the referee if you accept their position that these are the kinds of issues that the referee could have entertained.  We don't believe so, but they had an opportunity to raise it there. What did they do?  They didn't appear.  They didn't appear before the referee, and the referee called them on the phone -- called the counsel on the phone and said, "Participate."  They declined to participate.

So they had three shots at the apple in the state court proceeding, answer, opposition to summary judgment, and before the referee, and in not any of those instances did they raise the issue of the absence of notice of default and acceleration

as a defense.  We believe that alone constitutes waiver of that argument and precludes them from raising it as part of the objection to claim today.

We've made another waiver argument.  I'll call it special waiver for lack of a better term, and that is CPLR 3015.  CPLR 3015 says that if there was an issue which is a condition precedent, and you want to raise that as a defense, you need to plead it with specificity the failure to satisfy that condition precedent.  That's what the statute -- what the rule says.  They are -- we don't agree with this argument, but they are arguing -- the debtor is arguing that we failed to give notice, and that is a condition precedent to acceleration, which is a condition precedent to getting default interest.  That's their argument.  They did not plead it as required by CPLR 3015.  So that's an additional example of what I'll call special waiver as opposed to general waiver by virtue of their conduct.

They say that 3015 doesn't apply.  I'm not sure I understand that argument.  We're talking about the waiver or the pleading obligation in a state court foreclosure action, which would be governed by the CPLR, and the CPLR provision of 3015 would govern, but for some reason they seem to be saying because this is a federal bankruptcy action, that CPLR 3015 doesn't apply.  What would apply?  FRCP 9(c) if you accept that argument.  I don't accept it, but if you were to accept it hypothetically,

1  and what does it say?  The exact same thing.  It says that if

2  there is a condition precedent to a particular outcome and you

3  believe -- your defense is that the condition hasn't been

4  satisfied, you need to plead it with specificity.

5          So whether you say general waiver, whether you say

6  special waiver under 3015, or you say special waiver under FRCP

7  9(c), they waived the right to raise the absence -- the alleged

8  absence of notice of default and acceleration.

9          In addition, your Honor, if your Honor -- I'm taking

10  these in descending order, were to reject the waiver argument,

11  none of this matters.  None of it matters as a matter of fact

12  because the notice requirement only applies to a payment default

13  that is principal payment default.  There is a separate provision

14  of the mortgage that is article or paragraph 13(b) which says

15  that if there is a failure to pay a payment obligation other than

16  the payment of principal, and that failure to pay extends beyond

17  13 -- 15, sorry, 15 days, that an event of default has occurred,

18  and that provision does not require any notice whatsoever, so

19  that if that provision applies, which we believe it does here,

20  it doesn't require notice.  It happens by operation of law, so

21  there's an event of default, and resulting in acceleration,

22  resulting in entitlement to default interest.

23          Now, the debtor says -- is making two parts of this

24  argument.  One of them is that there is no event of default because

1  there's no notice.  I think I've addressed that.  They also say

2  there's no acceleration.

3       First of all, the operative language of the note and

4  the mortgage do not require affirmative notice of acceleration.

5   Again, if an event of default occurs, acceleration results, but

6  that doesn't really matter because we have cited cases that have

7  not been successfully distinguished I submit by the debtor that

8  say that the filing of the foreclosure complaint evidences

9  acceleration.

10      So what does the debtor say?  The debtor says, well,

11 those cases don't apply.  Why don't they apply?  Because there

12 was no notice requirement in those particular cases.  Here under

13 13(b) there was no notice requirement either, and so the filing

14 of the foreclosure complaint evidences any acceleration of that

15 note.  So we have event of default, acceleration resulting in

16 default interest.  So there is no defense, whether it's

17 Rooker-Feldman, issue preclusion, waiver, or as a matter of fact

18 in applying the terms that there was an appropriate event of

19 default, that there was acceleration resulting in entitlement

20 to default interest.

21      What debtor raises in response to all of this is there

22 was no actual notice, and that's where we get to this disputed

23 issue of fact, and I will reserve my right to argue that if your

24 Honor says that you need to get to the actual notice issue --

1        THE COURT:  Okay.  Yes.  Reserve your right to argue

2   that --

3        MR. RABINOWITZ:  I'll reserve the right to argue that.

4        THE COURT:  -- as the audience gets bigger.

5        MR. RABINOWITZ:  I understand.

6        THE COURT:  Anything else?

7        MR. RABINOWITZ:  Yes.  I'm going to finish the last

8   couple issues very quickly, and that is post-petition default

9   rate interest.  That's a major chunk of the dispute here.  The

10  debtor argues that the 362(d)(3) payments in fact were what we

11  were obligated to pay, which is contract interest.  We paid that

12  and we have no other rights to anything else.

13       First of all, a fair reading of that stipulation

14  indicates that it doesn't say that.  It preserves -- it doesn't

15  even address the issue it preserves all rights, and we cited 30

16  for the proposition, and even if you look at the language of section

17  362(d)(3), the payments under (d)(3) are equal to interest, but

18  not interest.  They're adequate protection payments, and what

19  Collier says is they are in an amount equal to.  They are not

20  interest.

21       So to argue that we were paying adequate protection

22  payments is an acknowledgement that that's all we were entitled

23  to, I think is belied by the language of 362(d)(3) and the terms

24  of that particular stipulation.

1        With regard to our general entitlement to post-petition

2   default rate interest, the debtor doesn't really address the 785

3   Partners, LLC case, Bankruptcy Court Southern District of New

4   York 2012.   There was a presumption that the contract terms apply.

5    It's a rebuttal presumption.   It's a burden on the debtor.   They

6   have to prove misconduct.   There has been no allegation that the

7   Greene Family is engaged in misconduct, and they couldn't prove

8   that we've engaged even if they alleged it, and although we don't

9   believe it applies under 506(b), if there is some proportionality

10  requirement, we cited case law for the proposition that 18 percent

11  has been held in other cases to be an appropriate default rate

12  interest.

13        Legal fees subject to a reasonableness standard

14  post-petition and all the other arguments with regard to vacating

15  the stay and the actual notice are reserved to the later hearing.

16        THE COURT:  Thank you.

17        MR. RABINOWITZ:  Thank you, Judge.

18        MR. NASH:  Just very quickly, Judge.  Rooker-Feldman

19  applies, res judicata applies, law of the case applies, and

20  collateral estoppel applies.  They just don't apply to this issue.

21   They apply to what was litigated in the state court, and that

22  is whether or not there was environmental misrepresentations under

23  the contract of sale.  That was what was litigated, and it's part

24  of the record.  The six-page decision talks about dismissal of

the debtor's counterclaims and dismissal of the debtor's
affirmative defenses based upon misrepresentations, and that's
what was litigated, so I am not claiming that there was an
environmental misrepresentation because truly that's collateral
estoppel, and that's all it is, but nobody got to the issue of
whether or not there is an entitlement to default interest.

        The order of reference doesn't say there's an
entitlement to default interest.  It doesn't say that at all.
That's in the record as well.  We didn't waive anything before
the referee.  We participated by telephone.  We wanted to be --
receive all the exhibits and all the transcripts because the issue
would have been put before the Supreme Court where it belongs.

        They never got to that point.  They argue
Rooker-Feldman.  You need a judgment.  There's no judgment of
entitlement to default interest.  There's not even an order
confirming the report.  This case was filed relatively early in
the foreclosure proceeding, and no preclusive effect from anything
denies my ability to challenge the entitlement to default
interest, and that's what we're doing.

        I dare them show where in any state court judgment,
order, anything where there is an award of default interest.
It's not there, and so that opens the door that we can look at
that entitlement in bankruptcy, and that is my position.  There

1   is nothing in that state court record.  There's actually two very

2   cryptic orders, but nothing that forecloses the issue of

3   entitlement to default interest, and they talk about 13 --

4   paragraph 13 and a mortgage.  Not controlling.  Paragraph 10 of

5   the note is controlling.  The note controls the entitlement to

6   default interest, and the note says you have to give proper notice

7   before you can have a proper event of default, before you can

8   have an acceleration which you need to get default interest.

9          They didn't do that, and so it's not foreclosed.  It's

10  not in the state court that the issue was actually determined,

11  and everything is open, is fair game in this Court and is open

12  for objection.

13         As to this issue as to entitlement of post-petition

14  default interest, the proof of claim is for pre-petition.  They're

15  trying to weave in this post-petition entitlement.  They didn't

16  file a claim for post-petition entitlement.  In fact, just the

17  opposite.  We signed a stipulation.  Now, they weren't the

18  attorneys on the stipulation, but they don't get a second bite

19  at the stipulation.  The stipulation was a negotiated

20  stipulation, and it says that we're paying $37,000 as the proper

21  amount to be paid based upon the non-default provisions of the

22  note, and we get certain rights when we sign that stipulation.

23

24         A key right we gave up is once we pay it we cannot say

1  you're undersecured and it's got to be attributed to principal.

2   We also gave up the right that we didn't think they were entitled

3  to 37,000.  We gave them 37,000 because under (d)(3) we only had

4  to pay 31,000.  So that was a negotiated deal, and that fixed

5  the post-petition interest under the note, and that's set forth

6  in the stipulation.

7          So what we have before the Court on the record, and

8  I know people like to talk in the abstract about these principles

9  of Rooker-Feldman, but we have to look at what the state court

10  really decided, and how do you do that?  You read their decision,

11  and if you read this decision of the state court you see they

12  decided the issue of whether or not there's a misrepresentation

13  under the contract regarding environmental, and they said but

14  there was a disclaimer so you can't sue on it.

15          This is routine stuff.  They sent it to a referee to

16  compute.  The referee computes, and we all know in the foreclosure

17  process that the action in terms of entitlement to those various

18  computations is in the context of a motion to confirm.  They never

19  even filed one.

20          So this is a fresh issue, and I'll remind the Judge

21  when we first dealt with this way back when we all acknowledged

22  that this was a fresh issue, and we went forward based upon those

23  stipulations to try to narrow the issues.

24          THE COURT:  Let me ask you a question.  So we're looking

1  at paragraph 4 of the stipulation.

2          MR. NASH:  Yes.

3          THE COURT:  Let's just look at this phrase.

4  "Regardless of any future determination of value of the debtor's

5  real property," we'll come back to that, "or determination of

6  any objection to the claim of the lender," and then there's words

7  about adequate protection payments.  Actually it's not called

8  that though, but right, it says, "Payments shall be allocated."

9  No.  362(d)(3) says -- that's adequate protection payments.

10  Okay.

11          So "Regardless of any future determination of value,"

12  would mean I think, but let's see if we all agree, regardless

13  of whether the property was valued at more or less than the amount

14  of their claim, right?

15          MR. NASH:  Right.

16          THE COURT:  So whether they were undersecured or

17  oversecured, we're going to give them this money and they're not

18  going to have to pay it back regardless of whether they're

19  oversecured or undersecured.  We're not going to argue about it.

20   They're not going to argue about it, so that may be determinations

21  that have to be made, but it's not going to effect these payments,

22  right?  So far so good?

23          MR. NASH:  Yes.

24          THE COURT:  Okay.  "Or determination of any objection

to the claim of the lender."  So what does that mean?

MR. NASH:  That means that if the lender's claim was thrown out or reduced to the amount less than what I paid, they don't have to give the money back either.

THE COURT:  Okay.  But your other point I guess would be that this objection to the claim of the lender doesn't include this post-petition issue?

MR. NASH:  No.  It's not that it doesn't include.  I think that language is dealt with in the sense that whatever --

THE COURT:  I thought you said before that they didn't file a claim for post-petition interest.

MR. NASH:  They didn't.  They didn't file.

THE COURT:  So you're not -- so that you're objecting to a claim that is not a claim about post-petition interest?

MR. NASH:  Right, but I'm also -- I want to refer to the language, which shall be allocated to post-petition interest at the applicable non-default contract rate of interest.

THE COURT:  Right.  I understood that, but okay.  All right.  That has -- that relates to how the money --

MR. NASH:  Right.

THE COURT:  -- is to be allocated and at what rate?

MR. NASH:  Right.

THE COURT:  Okay.

1          MR. NASH:  And that to me --

2          THE COURT:  You're saying that you're taking that a

3 step forward and saying that that is law of the case?

4          MR. NASH:  No.  It's not law of the case.  It's the

5 agreement.

6          THE COURT:  That is that they agreed.

7          MR. NASH:  Yes.

8          THE COURT:  Well, I so ordered it.  That they agreed

9 that they were not going to be seeking -- you read that to mean

10 that they agree that they would not be seeking post-petition

11 interest at the default rate --

12          MR. NASH:  Right.

13          THE COURT:  -- in the case?

14          MR. NASH:  Right.

15          THE COURT:  Period, paragraph.

16          MR. NASH:  They reserved a lot of things.  They didn't

17 reserve that.  They agreed to the non-default.

18          THE COURT:  I just wanted to understand the argument,

19 and I understand they don't agree.  Okay.

20          MR. NASH:  And so then I go back to the other point.

21  We don't even get to the post-petition until we figure out the

22 pre-petition, and so that to me is you can't mix and match those.

23          THE COURT:  I understand.

24          MR. NASH:  And just, you know, to sum up, if you have

1  to look at anything, I'd like you to look at paragraph --

2           THE COURT:  But at 15 million, you --

3           MR. NASH:  No.  I'm down to -- it starts at --

4           THE COURT:  What's your liquidation value?

5           MR. NASH:  No.  The liquidation.  I don't know the

6  liquidation.  We used 15 million because that's what we bought

7  the property for.  Okay?  We took back a purchase money mortgage

8  note.  We paid them 5 -- they were the prior owner of the property.

9   We paid them 5 million in cash.

10          THE COURT:  I understand.  That's why you had the

11 issues that you lost on in state court.

12          MR. NASH:  Right.  5 million in cash.  We paid down

13 the mortgage to less -- a little bit less than 4 million.

14          THE COURT:  No, no, no.  I'm not saying what are they

15 owed.  I'm saying what's your value as you stand here today or

16 what's your value on the date of the filing?  You put down 15

17 million.  That means they're oversecured.  You're not arguing

18 that they're not oversecured based on --

19          MR. NASH:  No.  When we did that stipulation --

20          THE COURT:  But you're not arguing that they're not

21 entitled to post-petition interest and attorney's fees.  It's

22 just a question of how much.

23          MR. NASH:  No.  When we looked at that $15 million

24 schedule that would reflect -- it says the contract -- the original

1  contract price.  It's not an indicia of what it was on that day.

2   Now, when we bought the property there was a much better ability

3  to develop that property before we met all this resistance from

4  the village.

5          THE COURT:  The kinds of things you need to disclose.

6

7          MR. NASH:  Right.

8          THE COURT:  That's why you need to disclose them, but

9  I'm trying to understand, is that an issue in this case?

10          MR. NASH:  No, because I've agreed -- it could be an

11  issue on feasibility, but I've agreed even if they're undersecured

12  they don't have to give me back that money.

13          THE COURT:  Well, okay, but if they don't give you back

14  that money, but --

15          MR. NASH:  But I also agreed I'm paying you based upon

16  -- they agreed you're paying me, but you don't have to give it

17  back if I'm undersecured, but we used the rate as the non-default

18  rate.

19          THE COURT:  And you'll keep paying it?

20          MR. NASH:  And I'll keep paying it.

21          THE COURT:  So the point is the issue of whether they're

22  undersecured or oversecured you're saying was dealt with in full

23  satisfaction, how ever that would come out by your paying this

24  amount of money?

1           MR. NASH:  Right.  And they agree that I'm paying it

2   at the non-default rate of interest.  It says that in the stip.

3           THE COURT:  Okay.  But -- okay.  But you still would

4   be entitled to -- they still would be entitled to adequate

5   protection if they were undersecured even more so.

6           MR. NASH:  Yes, yes.  I would assume.  I would assume

7   they're entitled to it, but again, and we did -- we went from

8   31, and your Honor will remember we went to $37,000, okay, because

9   we wanted -- is a settlement.  We wanted to deal with all those

10  various issues, and as part of the settlement we agreed they're

11  going to have a claims objection by a date certain as part of

12  it.  We're going to have a plan by a date certain as part of it.

13   You know --

14          THE COURT:  But your view would be that this stipulation

15  basically mooted out the issue of oversecured or undersecured

16  for purposes of post-petition.  What about attorney's fees?

17          MR. NASH:  The attorney's fees is not covered.  That's

18  one of the things that are not covered.

19          THE COURT:  All right.  I just wanted to understand

20  the position.

21          MR. NASH:  I do think what is covered is the agreement

22  that they get to keep it, and it's predicated upon a non-default

23  rate.

24          THE COURT:  Do we need to look at whether they're

1  undersecured or oversecured on the issue of attorney's fees, or

2  just on reasonableness?

3              MR. NASH:  Just on reasonableness.

4              THE COURT:  Okay.

5              MR. RABINOWITZ:  I'm sorry, Mr. Nash.  I didn't mean

6  to cut you off.  Are you finished?

7              MR. NASH:  Sure.

8              MR. RABINOWITZ:  Okay.  Your Honor, let's just briefly

9  look at the language that --

10             THE COURT:  I know.  I'm reading it.  I see.

11             MR. RABINOWITZ:  It says, "The total 362(d)(3) payments

12 shall be allocated to post-petition the applicable default

13 contract rate of interest."  It doesn't say that that's all we're

14 entitled to.

15             THE COURT:  I understand your position.  Okay.

16             MR. RABINOWITZ:  And just go to paragraph 8, and I know

17 i'm belaboring the record, but if your Honor would indulge me

18 for a moment, if you go to paragraph 8 it says, "Except as provided

19 herein, the stipulation is without prejudice to any motion

20 practice brought by any party in interest on any other issue not

21 covered by the stipulation."

22             THE COURT:  Okay.  And "Except as provided herein" lies

23 in the issue.  Okay.

24             MR. RABINOWITZ:  Right.  And your Honor, one last

1  point.  Two last points.  Mr. Nash says the issue was never

2  decided of default, acceleration, entitlement.  It was alleged

3  in paragraph of the complaint that I mentioned.  Those were within

4  counts one and two.  Summary judgment was granted in full on counts

5  one and two.  That includes all the allegations, and Acevedo

6  stands for that proposition where there wasn't an express finding,

7  but it was still a determination of default and acceleration.

8  It didn't require it.  It was presumed to have occurred because

9  it was alleged.  Here it was alleged, if your Honor applies

10  Acevedo, it's presumed that relief was granted on it, and then

11  the last issue and then I'll sit down is Mr. Nash says 13(b) doesn't

12  apply.  Why?

13          THE COURT:  Okay.  I got that.  Okay.  So I'm going

14  to compliment both side on their papers and on the argument.

15  It's a pleasure, and I gave you -- you're coming back December

16  3rd at 2:30.  Everything is going on for that day, and I hopefully

17  will have something to say about the threshold issue, and we'll

18  be looking at the changes.

19          It would be -- to the extent that you can agree on

20  language without prejudice to not agreeing on everything else,

21  it's fine.  It's okay to agree on language and still reserve your

22  rights to continue to kill each other.  It's all right.  Okay?

23   Thank you both.

24          MR. NASH:  Thank you, Judge.

98

1          MR. RABINOWITZ:  Thank you, Judge.

2

3                    *              *              *

4

5                         **CERTIFICATION**

6

7  I, Catherine Aldrich, certify that the foregoing is a correct

8  transcript from the electronic sound recordings of the proceedings

9  in the above-entitled matter.

10

12

14

16  _____        October 24, 2015

17          Catherine Aldrich