UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                                    Chapter 11

KEEN EQUITIES LLC,                                          Case No. 13-46782 (NHL)

                                          Debtor.
-------------------------------------------------------------x

**THIRD AMENDED AND REVISED DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE**

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR BANKRUPTCY COURT APPROVAL, BUT HAS NOT YET BEEN ACTUALLY APPROVED.

Keen Equities LLC (the "Debtor") hereby submits this Third Amended and Revised Disclosure Statement (the "Disclosure Statement"), pursuant to §1125 of Title 11, United States Code (the "Bankruptcy Code"), in connection with the Debtor's accompanying Chapter 11 Plan of Reorganization dated September 18, 2016 (ECF #116) (the "Plan").

## I.    OVERVIEW

**A.  Overview.**  The centerpiece of the Plan remains the restructuring of the mortgage debt encumbering the Debtor's development property in Orange County consisting of approximately 860 acres of largely vacant land (the "Lake Anne Property" or "Property"), utilizing principles of law recognized by the Supreme Court in <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 124 S.Ct. 1951 (2004) ("<u>Till</u>").  The Property is situated in the Village of South Blooming Grove (the "Village"), in close proximity to Route 208 and Clove Road.

**B.  Mortgage Status.**  The Lake Anne Property is encumbered by a purchase money mortgage (the "Greene Family Mortgage" or  "Mortgage") held by Hal J. Greene Living Trust, David A. Greene, and Trust u/w M Greene f/b/o Sabrina Greene (the "Greene Family"), as successor to Lake

Anne Realty Corp.  The Greene Family Mortgage has a current principal balance of $3,924,645.20 and was given to the Debtor in the original amount of $10 million in connection with the Debtor's acquisition of the site in 2006.  The Debtor originally paid $15 million for the Lake Anne Property and thereafter paid down the mortgage to around $4 million.

In bankruptcy, the Greene Family filed a secured claim in the total sum of $6,926,916.76, including alleged pre-petition default interest and other pre-petition costs and charges. On January 20, 2015, the Debtor objected (the "Objection") to the Greene Family Mortgage claim contending, *inter alia*, that the purported acceleration of the debt was improper due to defective notice.  The lack of a proper acceleration in turn negated the Greene Family's entitlement to pre-petition default interest (ECF No. 85).  The Objection recognizes the allowability of the principal debt and accrued pre-petition interest at the non-default rate and seeks to fix the pre-petition secured claim in the total sum of $5,035,979.70.

The Greene Family has opposed the Objection, contending that the Debtor is precluded from challenging any pre-petition amounts under principles of collateral estoppel and other theories. The Greene Family also disputes that there are any notice infirmities with its pre-petition declaration of a default.  While the Debtor is sanguine about its prospects, whatever the pre-petition amount is ultimately allowed by the Bankruptcy Court shall be paid in full under the Plan, with post-confirmation interest at a rate of 4.25% consistent with the proposed <u>Till</u> analysis.

Besides the Objection to the Greene Family's pre-petition claim, it also appears that there will be litigation over the Green Family's entitlement, if any, to post-petition default interest, legal fees and late charges.  The proof of claim filed by the Greene Family contains a per diem interest

charge of $1,935.44 based on a default rate of 18% per annum. The Greene Family has indicated it will seek to recover post-petition default interest. The Debtor submits that the Greene Family's post-petition default interest is precluded by prior stipulations and orders fixing adequate protection at the non-default rate. Additionally, even if the default rate is allowed, the Debtor disputes the Greene Family's computation of default interest.

The Debtor contests any entitlement to post-petition default interest and the other items for a number of reasons. Among other things, the entire post-petition analysis brings into play a separate set of principles and equitable considerations. Among the issues to be addressed is whether the Greene Family is actually "oversecured" within the meaning of Section 506(b) based on the "as-is" value of the Lake Anne Property as it currently stands without approval of the development. The Debtor has obtained an appraisal of the Lake Anne Property in its current "as-is" value of $6.7 million so the issue of value can be properly determined without guesswork. The Greene Family preserves the right to submit its own appraisal based on the Debtor's intended use of the Lake Anne Property under the Plan and the Debtor preserves its rights to object.

Conversely, the Greene Family disagrees that its claim is undersecured for any purpose, including Section 506(b) and disputes that an "as is" basis is an appropriate measure of value in light of the last sentence of Section 506(a)(1) of the Bankruptcy Code which provides that:

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

It is also the Greene Family's position (disputed by the Debtor) that if the Court determines that it is undersecured, it has an undersecured deficiency claim in Class 4 of the Plan which

will vote no in that class and constitutes a blocking vote in that class. The Debtor submits that, *inter alia*, proposed full payment treatment of the Greene Family Claim will negate this blocking vote. The Greene Family is also preserving its Section 1111(b) election rights, if any.

The Greene Family submits that its entire pre- and post-petition claim could be as much as $10,283,388.38 as of October, 2015. The Debtor submits that this amount is inflated based upon improper calculations and includes interest on interest, late charges and default interest and does not credit or reconcile the post-petition payments of approximately $800,000.

The Debtor, in turn disputes the Greene Family's entire legal position and likewise preserves all of its rights, including the right to amend the Plan to provide for a cure or reinstatement of the mortgage under Section 1124 depending on the disposition of the pending Objection.

C. **Application of Till.** Under the Plan, the Debtor shall pay the allowed amount of the Greene Family's secured mortgage claim as fixed by the Bankruptcy Court, in full, over an extended new term of no longer than sixty-six (66) months (and perhaps a shorter period), including an immediate cash pay-down of $1,000,000 to reduce the principal debt. The remaining principal balance will be paid together with post-confirmation interest at a fixed rate of 4.25%. This is consistent with the Supreme Court principles in Till (Prime Rate of 3.25% plus 1% risk factor). Interest and amortization shall be paid monthly commencing thirty (30) days after the Effective Date in equal monthly installments of $100,000 per month. Two amortization schedules are annexed hereto as Exhibits "A" and "B", respectively, reflecting the payments based on alternate scenarios: Scenario 1 projects payments if the Debtor's claim objection is sustained, and Scenario 2 projects payments if the Debtor's claim objection is overruled. As reflected in these

4

exhibits, the revised term could be as short as 43 months if the Objection is sustained, and 66 months if the Objection is overruled.  Additionally, if the Greene Family is allowed post-petition default interest, legal fees and late charges, then the amortization schedule would need to be amended accordingly based upon higher payments or a longer term or both.

The proposed post-confirmation interest rate of 4.25% is based on the analysis of Till made by Judge Gropper in In re Campbell, 513 B.R. 846, 855 (Bankr. S.D.N.Y.), that calculating interest to be paid under a plan is a "formula approach", where:

> [t]he formula starts with the prime rate, "which reflects a financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower," and then adjusts that amount for a risk of nonpayment posed by a bankrupt debtor.  541 U.S. at 479, 124 S.Ct. 1951. This adjustment for risk may require an evidentiary hearing on factors that impact it, including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* The *Till* court noted that by starting with the *low* prime rate and adjusting *upward,* the evidentiary burden is placed "squarely on the creditors" who would have easier access "to any information absent from the debtor's filing (such as evidence about the "liquidity of the collateral market.")" *Id.*

While Campbell was a Chapter 13 case, the same analysis of Till was applied by Judge Drain in the Chapter 11 case In re MPM Silicone, LLC, 2014 WL 4436335 *27-28 (Bankr. S.D.N.Y. 2014) *aff'd* 531 B.R. 321 (S.D.N.Y. May 4, 2015) (applying the formula approach, and holding that "Certainly there is no meaningful difference between the chapter 11, corporate context and the chapter 13, consumer context to counter *Till's* guidance that courts should apply the same approach wherever a present value stream of payments is required to be discounted under the Code. *Id.* 541 U.S. at 474.  The rights of secured lenders to consumers and secured lenders to

5

corporations are not distinguished in *Till*, nor should they be.  Nor does the relative size of the loan or the value of the collateral matter under *Till's* footnote 14, as it should not."

      In <u>MPM</u>, Judge Drain went on to explain how a <u>Till</u> rate of interest should be calculated:

> footnote 14 should not be read in a way contrary to Till and Valenti's first principles, which are, instead of applying a market-based approach, a present value cramdown approach using an interest rate that takes the profit out, takes the fees out, and compensates the creditor under a formula starting with a base rate that is essentially riskless, plus up to a 1 to 3 percent additional risk premium, if any, at least as against the prime rate, for the debtor's own unique risks in completing its plan payments coming out of bankruptcy.

<u>Id.</u>, at \*28.  Judge Drain further explained that with respect to risk, "Clearly, the risk of default is an important risk to consider in this type of analysis, but the more important risk is the ultimate risk of non-payment." <u>Id.</u>, at \*31.  Finally, Judge Drain states that "a formula of prime plus 1 to 3 percent . . . I believe is appropriate under Till and Valenti unless there are extreme risks".  <u>Id.</u> Notably, in affirming Judge Drain, the District Court found that "Judge Drain considered whether to apply a risk premium higher than 3%, but decided not to do so. This Court will not disturb his well-reasoned determination of the proper rate to apply."  <u>In re MPM Silicones, LLC</u>, <u>supra</u> 2015 WL 2330761 at \*11.

      The Greene Family submits that the interest rate to be applied under Section 1129(b)(2)(A)(ii) is the rate for similar loans in the marketplace which is the note rate of 6.5%.  If this Court applies the formula rate of <u>Till</u>, because of the significant risk under the Plan, the Greene Family submits that the risk adjusted interest rate should be at least the note rate of 6.5%,

calculated based on the present prime rate of 3.5% (which will likely be higher at the Effective Date) and a risk adjustment of 3.0%. The Debtor has a vastly different view, as noted below.

**D. Risk Factors.** In keeping with the <u>MPM</u> analysis, the Plan proposes a fixed 4.25% interest rate, predicated on the current Prime Rate of 3.25% plus a risk factor of 1%. The Debtor submits that a 1% risk factor is appropriate for several reasons.

<u>First</u>, the Debtor's use of the prime rate of 3.25% as the baseline is already on the high end of the spectrum. More recent <u>Till</u> cases employ a lower treasury rate as a starting point. Thus, the Debtor is proceeding with a relatively high rate to begin with, which should be taken into account in assessing any additional risk.

<u>Second</u>, the <u>Till</u> analysis looks to the risk of actual non-payment. On this score, the Debtor's post-petition history of making consistent monthly payments over a two-year period certainly militates against future non-payment and portends continued timely performance under the Mortgage.

<u>Third</u>, the value of the Lake Anne Property will be enhanced by the future development and continued expenditure of funds on the project. Following receipt of all approvals, the Lake Anne Property is projected to yield a value of $120,000 per buildable lot, providing the Greene Family with the benefit of future equity.

<u>Fourth</u>, the Plan provides for an initial principal pay down of $1,000,000, and significant amortization each month creating an escalating and expanding equity cushion.

<u>Fifth</u>, the Debtor is also prepared to establish an interest reserve of $500,000 on or about April 1, 2016 to further address concerns regarding feasibility.

The Debtor has worked steadily on obtaining approval for a development to build 600 new homes. Although delays have been encountered because of questions relating to the level of potable drinking water on site, the Debtor believes it will be able to overcome any further questions with the location of four new wells.

The Debtor has submitted a 72 hour Test Plan to NYSDEC and County Department of Health to demonstrate that the project meets all Department of Health water requirements. Both of these agencies have approved the test plan. As a matter of courtesy, the Debtor has also submitted the same 72 Hour Pump Test Plan to the Village, which is currently reviewing the protocols involved. The protocols, however, are the same protocols that were approved by all agencies (including the Village) last year, with respect to other wells on the same site. Thus, there is no legitimate reason why the Village should not approve the unchanged protocols so the 72 Hour Pump Test Plan can be undertaken. In the interim, the Debtor's investors will fund the Plan and continue to pay all post-petition and post-confirmation debt service, taxes and insurance, plus the costs of the development.

In sum, given the level of investor contributions of approximately $3.2 million since the Chapter 11 filing alone, plus additional new value contributions of at least $1.8 million, plus another $500,000 for interest reserves, the Debtor submits that it can establish a relatively low risk of future non-payments. Indeed, it would be foolhardy to infuse millions of dollars to re-launch the project, only to allow the Greene Family Mortgage to again go into default. Moreover, it is also noteworthy that certain amounts of the Greene Family Mortgage have been personally guaranteed by William Lefkowitz and Joseph Strulowitz. The existence of these guarantees

8

should also be considered in assessing feasibility, as they provide potential recourse to third parties independent of the Property.

In contrast, the Greene Family submits (subject to the Debtor's opposition) for the following reasons, that for the purposes of the <u>Till</u> formula approach, the maximum risk adjustment of 3% should be applied to a base rate of prime which is presently 3.5%.

The Debtor has no current revenues. The Plan does not provide for the investor's guarantee of any Plan obligations. In addition, although the Debtor has represented that the investors have and will stand behind the Plan, there has been no disclosure of the investors' net worth. The new money coming in at confirmation is $2,300,000 which consists of a $1,800,000 new value contribution and a $500,000 interest reserve. But the Plan obligations could be as high as $10,500,000. The only means of payment under the Plan over and above the new money of $2,300,000 is sales of lots after approvals and completion of infrastructure.

Based on these facts, there is high risk of non-payment because there are presently no approvals and no infrastructure. Further, there is no demonstration of the cost of and how the obtaining of the approvals and infrastructure will be funded. The Debtor is in the earliest stages of obtaining approvals and the Debtor acknowledges that there have been intentional delays by the municipality in connection with obtaining the approvals. If there is a default of Plan obligations prior to approvals, the Greene Family's remedies will not realize the full amount of its claim.

Lastly, the Debtor argues that there is an existing personal guaranty of Mr. Lefkowitz and Mr. Strulowitz of the Greene Family Note. Those guarantees are not absolute and

9

unconditional but rather limited guarantees. Further, there has been no disclosure as to the net worth of those guarantors in order to assess whether the guarantees have value.

For the foregoing reasons, the Greene Family submits that there is maximum risk and if this Court adopts the formula rate, there should be the maximum, rather than the minimum, risk adjustment.

E.    **Voting**.  In accordance with section 1126(f) of the Bankruptcy Code, all classes of claims that are impaired may vote to accept or reject the Plan. A class of claims is impaired if the Plan modifies, alters or changes the Claimant's legal, equitable or contractual rights against the Debtor. In this case, the Class 1 Secured Mortgage Claim of the Greene Family, the Class 3 Claims of security deposits, and the Class 4 Claims of General Unsecured Creditors are non-insider impaired classes eligible to vote on the Plan. The Debtor, however, reserves the right to modify the treatment and classification of Class 2 and Class 5 claims. Conversely, the Greene Family believes that Classes 3 and 4 are artificially impaired and Class 3 consists of priority claims which cannot be used to satisfy Section 1129 (a)(10). In addition, if the Greene Family is determined to have an allowed unsecured deficiency claim, it believes it will be a blocking vote in Class 4 because it will comprise more than one third of the dollar value of claims in that Class and will vote no for the Plan. The Debtor disagrees with this position and reserves all rights to challenge these theories or file an amended plan to address the matter as may be necessary.

Ballots for acceptance or rejection of the Plan will accompany the Plan, and should be completed by all voting classes of creditors. After carefully considering this Disclosure Statement and the Plan, please indicate your vote on the enclosed ballot and return same before

the voting deadline to Goldberg Weprin Finkel Goldstein LLP, Attn Kevin J. Nash, 1501 Broadway, 22nd Floor, New York, New York 10036. Facsimile: (212) 422-6836. E-mail: KNash@GWFGlaw.com.

In order to be counted, your ballot must be actually received by Goldberg Weprin Finkel Goldstein LLP, Attn Kevin J. Nash, 1501 Broadway, 22nd Floor, New York, New York 10036, on or before _____, 2016 (the "Voting Deadline"). All forms of personal delivery of ballots including overnight delivery service, courier service, and delivery by hand are acceptable. Facsimile and electronic transmissions are acceptable as well. There is no need to file your Ballot with the Clerk of the Bankruptcy Court. If your ballot is damaged or lost, or if you do not receive a ballot to which you are entitled, you may request in writing a replacement by contacting Goldberg Weprin Finkel Goldstein LLP, Attn Kevin J. Nash, at the stated address.

Only actual votes will be counted. A failure to return a ballot will not be counted either as a vote for or against the Plan. If a creditor casts more than one ballot voting the same Claim before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior ballots.

F.      **Contested Confirmation.** Your vote on the Plan is important. In order for the Plan to be accepted on a consensual basis, pursuant to 11 U.S.C. §1129 (a), each class must accept the Plan. Acceptance is based upon affirmative votes from each class of creditors of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims of those who actually vote.

Even if the Greene Family votes against the Plan, the Bankruptcy Court may still confirm the Plan over the Greene Family's objection if (a) at least one impaired class votes to accept the Plan and (b) the Court finds that the Plan (i) does not unfairly discriminate against the Greene Family, and (ii) accords fair and equitable treatment to the Greene Family.

The Greene Family disagrees that the Plan can be confirmed as a matter of law because, in the Greene Family's opinion, the Plan (i) cannot satisfy the one impaired accepting class requirement of Section 1129(a)(10) of the Bankruptcy Code, (ii) violates the absolute priority rule set forth in Section 1129(b)(2)(B) of the Bankruptcy Code and (iii) is not fair and equitable as to the Greene Family as required by Section 1129(b)(2)(A)(i) because it seeks to impose a covenant in the form of a release price that was not contained in the pre-petition loan documents. The Debtor, of course, does not share this view, and is prepared to adjust release price issues once actual sales materialize.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan on _____, 2016 before the Hon. Nancy Hershey Lord in Courtroom 2529 of the United States Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY. Any party in interest may object to confirmation of the Plan. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan, be served upon: counsel to the Debtor, Goldberg Weprin Finkel Goldstein LLP, Attn: Kevin J. Nash, 1501 Broadway, 22nd Floor, New York, New York 10036, on or before _____, 2016, in the manner described in the order scheduling hearing on confirmation accompanying the Disclosure Statement. The Confirmation

Hearing may be adjourned from time to time without further notice other than by announcement in open court.

    **G.**  **Disclaimer.**  The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of the Plan.  No representations other than those explicitly set forth in this Disclosure Statement are authorized concerning the terms of the Plan or the Debtor's development plans, the scope of assets or the extent of the Debtor's liabilities.

    This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the case and certain financial information.  Although the Debtor believes that the Disclosure Statement is accurate, the terms of the Plan govern, and creditors are advised to review the Plan in its entirety.

  **II.**  <u>**EVENTS LEADING UP TO THE BANKRUPTCY FILING**</u>

    The Lake Anne Property was purchased in 2006 for the intended development of residential homes to meet the growing needs of the Kiryas Joel community.  For many years, the project stalled because of resistance from the Village of South Blooming Grove.  At various times, the Debtor pursued litigation to challenge certain local action and ultimately the Lake Anne Property became subject to foreclosure proceedings.  Despite these disappointments, the Debtor's investors still believe strongly in the project and filed the Chapter 11 petition with a renewed focus to adopt a more conventional approach in the hope that the project can proceed without controversy.  The Debtor is currently comprised of eleven (11) investors who are relatively prominent businessmen and investors in the Satmar community.  The business interests of the investors include a variety of companies, such as giftware, electronics and lumber.  Additionally,

many of the investors also separately own real estate and commercial properties.  A list of the current investors is annexed hereto as <u>Exhibit</u> õCö, together with their individual post-petition contributions.

The Greene Family takes the position that the investors are not personally responsible to fund the Plan and the existing personal guarantees are limited and relate only to two of the eleven investors.  Moreover, the Greene Family contends that the financial wherewithal of the investors is relevant to a finding of feasibility under Section 1129(a)(10).

### III.    <u>SIGNIFICANT EVENTS DURING THE BANKRUPTCY</u>

The Debtor has primarily focused on two separate courses of action during the Chapter 11 case, dealing with the Greene Family in the Bankruptcy Court and seeking the required approvals from the Village to begin construction at the Lake Anne Property on a local level.

### A.  Legal Proceedings.

With respect to the Greene Family, immediately after the petition was filed, the Greene Family moved for permission to proceed with the eviction of certain tenants who remained at the Lake Anne Property.  The Debtor noted that most of the tenants had already left, and wanted at least one tenant to remain as a õpresenceö so the Lake Anne Property would not be completely vacant.  Accordingly, the Debtor argued that the motion was effectively a disguised vehicle to retain the State Court receiver in bankruptcy.  Ultimately, the Debtor was able to negotiate a consent order which partially lifted the automatic stay to permit the sheriff to continue

agreed upon evictions, while insuring that the appointment of the receiver was terminated and that two people occupied the Property (ECF No. 32).

Section 362(d)(3) requires the Debtor to commence making adequate protection payments within 90 days of the Chapter 11 filing. The amount of the payment is fixed by a formula contained in the statute. In early January, 2014, and well within the 90 day period, the Debtor forwarded the first payment, in the amount of $21,258.50. The Debtor calculated the payment based on the non-default interest rate of 6.5% per annum, multiplied against the principal balance of $3,924,645.93, divided by 12 [(6.5% of $3,924,645.93 = $255,101.99) (255,101.99 divided by 12 = $21,258.50 per month)].

The Greene Family protested the amount of the payment, claiming that the formula required monthly installments of $37,520.80 and the non-default interest should be applied to the total allowed debt. To protect against a possible default, the Debtor moved for a clarification of the amount owed, following which a stipulation was negotiated for monthly payments of $31,000. (ECF No. 82)

In July, 2014, the Greene Family again moved to vacate the stay to permit it to continue the foreclosure action. The Debtor opposed the motion, citing the progress being made to obtain approvals for the development, and noting that the process was a lengthy one under the circumstances. The parties negotiated a stipulation pursuant to which the adequate protection payments were increased to $37,520.80, in return for the Greene Family's agreement to extend the Debtor's exclusive period to file a plan of reorganization under September 15, 2015 (later

15

extended by agreement to September 18). This stipulation was approved by Order dated December 23, 2014.

Thereafter, the Debtor engaged in an in-depth analysis of the validity of the Greene Family's claim, filed in the amount of $6,926,916.76. The Debtor prepared a detailed objection to the claim, primarily challenging default rate interest of over $1.4 million, and $460,000 in late charges, legal fees and other add-ons. In seeking to reduce the claim to $5,060,979.70, the Debtor focused on the precise language of the loan documents, which permit acceleration of the debt and imposition of default rate interest only after proper written notice sent by certified mail, return receipt requested, to specifically identified addresses. In fact, the claim filed by the Greene Family included a written notice that was sent by regular mail, and was incorrectly addressed.

In its response, the Greene Family for the first time provided proof of a second mailing of the notice by certified mail. Notably, however, there was a return receipt from only one addressee, which was clearly not the same address for the Debtor as provided in the loan documents. There was no return receipt from the second required addressee, the Debtor's then-attorney, who denied any record or recollection of receipt of the notice.

The Greene Family also raised several other issues, including preclusion under the doctrines of res judicata, Rooker-Feldman, collateral estoppel and waiver, all of which generally bar parties from re-litigating issues in bankruptcy which were previously tried in the state court. The Greene Family also submits that notice of default and acceleration, to the extent required, were properly given in accordance with the loan documents, or were not required or were cured

by the foreclosure complaint.  The Greene Family also cross-moved for relief from the automatic stay to allow the State Court to confirm the Referee's Report.

The Debtor has filed a reply, pointing out that no final order was entered in the state court foreclosure proceeding, and that the notice issue was never directly addressed by the state court.

The Debtor also objected to the claim for legal fees as including services outside of the limited language in the loan documents for recovery of the costs of collection.  The Debtor further objected on the ground that the supporting documents were incomplete and entirely deficient to support the requested fees.  The Greene Family's position is that it submitted invoices of its attorneys to support its claim redacted to preserve attorney/client privilege and has offered to produce the redacted portions subject to an appropriate protective order preserving privilege or for an in camera review.

An initial hearing on the objection to the claim was held on October 22, 2015, and the matter has been adjourned from time to time with the next hearing for further proceedings scheduled for January 20, 2016.

### B.  Status of the Development.

The second major area of focus has been the Debtor's extensive efforts to re-launch the project, working with a new team of professionals, [i.e. Steven Barshov, Esq. (Special Real Estate Development counsel) and Simon Gelb of CPC].  An updated and detailed summary of the current status of the project has been prepared by Mr. Barshov and is annexed hereto as <u>Exhibit</u> "D", together with supporting schedules.

Due to delays with respect to issuance of well permits (in which the Village has dragged its feet) as well as the Village's failure to proceed expeditiously to confirm full and safe yields of water at the site, the project is about 12 months behind schedule. However, the Debtor is still optimistic that it will be able to overcome any remaining water issues, at which time the Village Planning Board has previously confirmed that it will issue a Notice of Intent to serve as Lead Agency. In fact, the Village Planning Board has indicated it intends to serve as the Lead Agency and a formal resolution will be entered in January 2016. This is a major milestone in the project and constitutes an important element in the SEQRA review process, which has yet to commence. Specific details as to the current timeline are set forth in the status prepared by Mr. Barshov (see Exhibit "D"). The Greene Family's position is that the approval process is in its earliest stages, has a long way to go and the Debtor's estimate of the time it will take and the likelihood of completion are unjustifiably optimistic.

Financially, the project can be a "field of dreams" in the sense that if the Debtor builds a development, there is a strong demand for new homes. This project will attract families from the Kiryas Joel community. Approximately 4,000 families live in Kiryas Joel alone, with a total population of approximately 24,000 people. There have been serious internal discussions about proposing annexation of the Lake Anne Property into Kiryas Joel. But at this point the Debtor is still pursuing a separate project on its own so long as the Village processes the pending application in a manner that is fair and reasonable and in accordance with applicable law.

When finally approved, the Debtor projects that buildable lots (with infrastructure) will sell for approximately $120,000 per lot. Additionally, completed homes will sell for

approximately $450,000.  Based on sales of 600 lots, the project is expected to generate gross revenues of approximately $72 million which forms a significant source of funds to satisfy the Mortgage independent of investor contributions.  The Debtor is prepared to devote 100% of the net proceeds from each future lot sale (net proceeds mean gross proceeds less regular and commercially reasonable closing costs, professional fees and commissions) to be paid to the Greene Family until its allowed claim is paid in full.

It is the Greene Family's position that the Debtor's future projections are relevant to a discussion of value for purposes of Section 506(b) which should lead the Court to conclude that the Greene Family's claim is over-secured for purposes of Section 506(b).  Additionally, the Greene Family reserves all rights to contest the legal permissibility of the release price provision under the Plan on any individual lots as not fair and equitable under Section 1129(b)(2)(A)(i) and otherwise.

### C.  Post-petition Funding.

After bankruptcy, a series of meetings were held among the investors of the Debtor to develop a protocol and budget for capital contributions going forward.  These meetings resulted in the adoption of five separate resolutions establishing the agreed framework to provide future funding for operations and development.  The resolutions were unanimously passed, and then approved by Order of the Bankruptcy Court entered August 25, 2014 (ECF No. 60) (the "Funding Order") after a formal motion to approve the future funding of the Debtor pursuant to Section 364 of the Bankruptcy Code.  Copies of the Funding Order and the resolutions are collectively attached hereto as Exhibit "E".

19

These resolutions have been in effect since the summer of 2014 and have been honored by the investors, who continue to make capital contributions. Since adoption of the resolutions, a total of $4,133,244.86 of new capital has been contributed by the members. An operating budget for 2016 is attached hereto as <u>Exhibit</u> ōFö.

The Plan provides that the Funding Order will continue to govern going forward after confirmation, thereby establishing a source of funding for both the Plan payments to creditors, and for on-going carrying costs and operational expenses until the Lake Anne Property can throw off sufficient income to meet these obligations.

The Greene Family submits, and the Debtor disputes, that the Funding Order does not obligate the investors to make any contribution to fund approvals, infrastructure or Plan obligations.

## IV.    <u>THE PLAN</u>

The Plan classifies pre-petition claims and equity interests involving the Debtor into various classes as outlined below.

Administrative expense claims (i.e. post-petition claims) are not classified and shall be paid in full as allowed by the Bankruptcy Court. Administrative Expense Claims primarily include the allowed fees and expenses incurred by the Debtorøs professionals, including bankruptcy counsel and special land development counsel. All professional fees and expenses remain subject to Bankruptcy Court approval, following the filing of a written application and additional notice to creditors. Once allowed, professional fees and expenses will be paid on the

Effective Date or pursuant to such other terms as are mutually acceptable to the Debtor and its counsel.

All other post-petition debts and obligations, including quarterly fees due to the Office of the United States Trustee, are current and will continue to be paid by the Debtor in the ordinary course of business in maintaining and operating the Lake Anne Property without formal treatment under the Plan.

**A. Summary of Classification and Treatment of Claims and Equity Interests**

| Class | Designation | Impaired |
|-------|-------------|----------|
| Class 1 | Greene Family Claim | Yes |
| Class 2 | Claims of Governmental Units | No |
| Class 3 | Security Deposit Claims | Yes |
| Class 4 | Unsecured Claims | Yes |
| Class 5 | Claim of Erno Bodek | Yes |
| Class 5 | Equity Interests | No |

**B.  Classification, Treatment and Voting**

**Class 1: The Greene Family Mortgage Claim**

**Classification** - Class 1 consists of the allowed secured claim of the Greene Family in such amount as finally determined by the Bankruptcy Court following resolution of the Debtor's pending claim objection (ECF No. 85).

**Treatment** – Once fixed and determined by entry of a Final Order, the Class 1 Greene Family Claim shall be restructured under a _Till_ based mortgage restructuring.  More particularly, the allowed secured claim shall be immediately paid-down by $1.0 million via the Initial Cash Pay Down to create the Revised Principal Balance, which shall then be memorialized by a revised note and mortgage (hereinafter the "Revised Mortgage Note").  The Revised Mortgage Note shall conform to the terms of the Plan and contain other customary terms and conditions.  The Revised Mortgage Note shall be paid over a period of between 43 months and 66 months (the "Revised Maturity Date"), starting thirty (30) days after the Effective Date.  The Revised Maturity Date depends on the final amount of the Greene Family's allowed claim.  If the claim is reduced, the term is shorter based on the equal monthly payments of $100,000.  As noted above, if the claim is allowed in a greater amount, then the amortization schedules will need to be amended and adjusted accordingly to either increase the monthly payment or extend the term.  The Revised Principal Debt shall be paid with post-confirmation interest at a "_Till_" rate equal to 4.25% per annum, in monthly payments of $100,000 for amortization and interest until the debt is paid.  The Debtor shall have the right to prepay the Revised Mortgage Note without penalty at any time.

22

The Class 1 Secured claim of the Greene Family shall survive confirmation of the Plan as a first lien encumbering the Lake Anne Property; provided, however, the Debtor and Greene Family shall execute and file a modified mortgage instrument on the Effective Date conforming to the Plan and otherwise providing for partial release(s) of the modified mortgage by the Greene Family in the event of future sale(s) of individual lots in consideration for receipt of 100% of the net proceeds from future sales until the allowed claim is paid in full. Additionally, upon the Effective Date, the pending foreclosure action commenced by the Greene Family in the Supreme Court, Orange County (Index No. 563-2011) shall be dismissed and discontinued and the pending notice of pendency shall be vacated, all without prejudice to the Greene Family's continuing rights to enforce the personal guarantees. The entry of the Confirmation Order shall provide the Debtor with the requisite authority to take all necessary action to effectuate the recording of the modified mortgage and dismissal of the foreclosure action. To the extent that the Debtor refinances the Revised Mortgage Note prior to the Revised Maturity Date hereunder, the Greene Family shall assign, without representation or warranty of any kind or nature, the modified mortgage instrument to the Reorganized Debtor's designated lender without additional fees or expenses other than reasonable attorney's fees for preparing the appropriate assignment documents provided that any recording fees or taxes shall be borne by the Debtor.

As set forth previously, the Greene Family submits, and the Debtor disputes, that its treatment under the Plan violates (i) Section 1129(b)(2) because the interest rate is too low and (ii) Section 1129(b)(2)(A)(i) as not being fair and equitable because it imposes a release price that did not exist in the pre-petition loan documents.

**Voting** – Because the allowed Class 1 Greene Family Claim is being restructured under a Till analysis, it is impaired and eligible to vote on the Plan. The Debtor can still confirm the Plan over the Greene Family's anticipated objection because the Plan treats the allowed secured claim "fairly and equitably" within the meaning of 11 U.S.C. § 1129(b)(2)(B). Among other things, the Greene Family will receive deferred cash payments equal to the present value of its allowed secured claim. For the reasons previously set forth, the Greene Family disputes that its treatment is fair and equitable.

**Mutual Reservation of Rights** – The parties agree that the Greene Family reserves its rights to make a Section 1111(b) election for a period up to the earlier of fifteen (15) days (i) after the pending claim objection is decided by the entry of an Order which becomes final and non-appealable and for which no stay pending appeal has been issued; or (ii) prior to the first date fixed for the hearing on confirmation of the plan (the "Election Deadline"). If the Greene Family elects to be fully secured pursuant to Section 1111(b) of the Bankruptcy Code by the Election Deadline, the Debtor reserves its right to amend the treatment of the Greene Family claim under the Plan which amendment shall be filed and served on the Greene Family within seven (7) days after the Election Deadline provided that the Greene Family shall file any objection to the amended treatment within five (5) day of the filing of the amendment.

**Class 2: Claims of Taxing Authorities**

**Classification** – Class 2 consists of the allowed secured or priority tax claims held by governmental units, including State of New York and Orange County.

**Treatment** – The Debtor shall pay all allowed Class 2 claims of governmental units in full on the Effective Date, totaling approximately $306,000, whereupon any pre-confirmation real estate tax liens held by Orange County shall be deemed satisfied and extinguished.

The City of New York filed a priority claim in the amount of $3,850 for alleged unpaid City unincorporated business taxes. The Debtor never operated in New York City, and does not believe that this claim is valid. If the City does not agree to voluntarily withdraw the claim, the Debtor intends to object to the claim prior to Confirmation. To the extent that the City obtains an allowed claim, it will be paid in full on the Effective Date or under such other terms as the parties may agree.

**Voting** – Class 2 tax liens are unimpaired.

**Class 3: Claims of Former Tenants**

**Classification** – Class 3 consists of the allowed claims of former tenants for return of security deposits. There are three Class 3 creditors with claims totaling $4,852.

**Treatment** – The Debtor shall pay all allowed Class 3 claims in full within one year of the Effective Date.

**Voting** – Class 3 claims are impaired and entitled to vote on the Plan. The Greene Family submits, and the Debtor disputes, that this Class is not impaired and not entitled to vote because it comprises priority claims which cannot be used to satisfy Section 1129(a)(10) and the under the doctrine of artificial impairment.

**Class 4: Unsecured Claims**

25

**Classification** – Class 4 consists of the allowed Unsecured Claims of non-insider creditors.  There are two Class 4 creditors with claims totaling $29,440.

**Treatment** – The Debtor shall pay all allowed Class 4 claims in full within one year of the Effective Date.

**Voting** – Class 4 claims are impaired and entitled to vote on the Plan.  The Greene Family submits that this Class is not impaired under the doctrine of artificial impairment.

## Class 5: Claim of the Former Equity Interest Holder

**Classification** – Class 5 consists of the allowed claim of Erno Bodek ("Bodek"), a former member of the Debtor, whose membership interest was diluted after Bodek failed to complete required capital contributions.  Because the Bodek claim is predicated on a partial return of capital, it is being separately classified from general unsecured creditors.

**Treatment** – Consistent with the Funding Order, the Debtor shall pay the Class 5 Bodek claim the total sum of $100,000, amounting to 10% of the filed proof of claim, in full settlement, satisfaction and discharge of all rights that Bodek has or may have against the Debtor, the Reorganized Debtor or the Lake Anne Property.  The payments to Bodek shall be made in twelve (12) equal consecutive monthly installments commencing on the Effective Date.  To the extent necessary, the Debtor shall file objections to Bodek's claim to reduce it consistent with the Funding Order.

**Voting** – The Class 5 claim is impaired, but potentially not entitled to vote on the Plan since Bodek is a former member of the Debtor and thus a possible insider within the meaning of the Bankruptcy Code.  The Greene Family submits, and the Debtor disputes, that Bodek is an insider and his vote cannot be counted for purposes of satisfying Section 1129(a)(10).

## Class 6:  Equity Security Holders

**Classification** – Class 6 consists of the current equity interests in the Debtor held by the eleven investors as noted in the Funding Order.

**Treatment** – The current Class 6 Equity Interests (excluding Bodek) shall be treated in accordance with the Funding Order and each investor shall be eligible to retain his

continuing membership interest in the Reorganized Debtor so long as the investor continues to timely make all required capital contributions pursuant to the Funding Order. Investors who fail to make necessity capital contributions are subject to dilution as set forth in the Funding Order. For avoidance of doubt, the Funding Order is hereby incorporated as part of the Plan and governs the future rights of the Debtor's investors on a post-confirmation basis.

**Voting** – As insiders, Class 6 equity holders are not eligible to vote on the Plan.

## V.  **MEANS FOR IMPLEMENTATION OF THE PLAN**

**Funding**. The Plan shall be financed through additional New Value Contributions to be made by the Debtor's investors, projected to aggregate approximately $1,800,000 plus an interest reserve of $500,000 to be established as additional collateral. The reserve can be used by the Debtor to pay post-confirmation debt service as necessary on terms to be developed with the Greene Family. The contributions shall be made on a *pro rata* basis. Since the Chapter 11 filing, the Debtor's investors have contributed the total sum of approximately $3.2 million to re-launch development of the Lake Anne Property and pay ongoing post-petition debt service to the Greene Family plus real estate taxes and insurance.

**Vesting of Assets.**

(a)    **The Property**. All assets of the Debtor's estate, including the Lake Anne Property, shall revest in the Reorganized Debtor, free and clear of all claims, liens, taxes and encumbrances, except that the Lake Anne Property shall remain subject to the modified mortgage instrument to be provided to the Greene Family pursuant to the Plan.

(b)    **Preservation of Other Rights and Claims.**  All other claims and causes of action, if any (and none are presently known or contemplated) belonging to the Debtor shall remain property of the Debtor's estate and shall be vested in the Reorganized Debtor (i.e. the Debtor following Confirmation of the Plan).

**Post-Confirmation Management.**  Pending completion of the development, the Reorganized Debtor shall continue to be managed by the Debtor's steering committee headed by Y.C. Rubin, without additional compensation for any of the investors involved, except Mr. Rubin, who, by agreement with the investors, shall be compensated for his services since the filing of the Chapter 11 petition and for the period after confirmation in the amount of $100,000.  This compensation shall accrue and not be payable until the development is completed, sales of lots occur and the secured claim of the Greene Family is paid in full.

**Assumption of Executory Contracts**.  Any existing executory contracts, are hereby deemed assumed pursuant to 11 U.S.C. §365 without the necessity of the filing of a formal motion.  The only known executory contract relates to the existing consulting agreement with Simon Gelb and CPC LLC.  This consulting agreement shall continue to be in effect after confirmation of the Plan and there are no known cure costs.

**Retention of Jurisdiction**.  The Bankruptcy Court shall retain jurisdiction to consider the following matters after confirmation of the Plan: (a) to enforce, implement, interpret or modify the Plan under applicable provisions of the Bankruptcy Code; (b) to allow, disallow, determine, liquidate or classify, any secured or unsecured claim including, without limitation, the resolution of any request for payment of any Administrative Expenses, the resolution of any

pending objections to the allowance any Claims, and the resolution of any pending adversary proceeding; (c) to grant or deny any and all applications for allowance of compensation and reimbursement of expenses by the professionals retained during the bankruptcy case; (d) to resolve any motions or applications pending on the Effective Date of the Plan; and (e) to enter a final decree closing the bankruptcy case based upon substantial consummation of the Plan.

> **Disputed Claims Escrow**.   The Plan provides for funding a disputed claims escrow.  The Debtor has filed an objection disputing approximately $5,300,000 of the claim of the Greene Family.   It is the position of the Greene Family that this Disclosure Statement fails to describe how the escrow reflecting this disputed claim is to be funded.  It is the Debtor's position that the escrow relates to disputed claims other than the Greene Family, and the Greene Family claim needed to be fixed before the start of confirmation, which will eliminate any escrow issues.

## VI.   BASIC REQUIREMENTS FOR CONFIRMATION OF THE PLAN

While § 1129(a) of the Bankruptcy Code lists a number of findings that need to be made prior to Confirmation, two of the requirements are worth highlighting for purposes of the Disclosure Statement:

> **A.      Feasibility Of The Plan.**  As a prerequisite to confirmation, Bankruptcy Code § 1129(a)(11) requires that the Debtor and its equity interest holders demonstrate their ability to fund the Plan and establish that confirmation is not likely to be followed by the need for further financial reorganization or restructuring.  To put it in the vernacular, "the proof is in the pudding".  Thus, the Debtor intends to establish a reserve of $1,800,000 so the Court and creditors can be assured that the monies needed to confirm the Plan are readily available.

Going forward, the Debtor proposes to pay $100,000 per month on the Restructured Mortgage Debt for amortization and interest at the <u>Till</u> rate of 4.25% for between 43 and 66 months, depending on the final allowed amount of the Greene Family pre-petition claim.

As is clear from these amortization charts annexed hereto as <u>Exhibits</u> "A" and "B", respectively, the Debtor's proposal to pay $100,000 is adequate to pay down the Restructured Mortgage Debt pending sales of future lots.  Annexed hereto as <u>Exhibit</u> "G" is composite statement showing the expenditure of funds for 2014 and 2015, since the Chapter 11 filing.

The Greene Family submits, and the Debtor disputes, that the Plan is not feasible under Section 1129(a)(11) for the following reasons:

The Debtor's estimate of the time necessary to obtain the approvals is too short given the delays and past experience.  Further, the uncertainty in obtaining the approvals is not adequately described given that the process is in its earliest stages.

The Debtor has no source of revenue to fund approvals, infrastructure and Plan obligations other than sales of lots, which require completion of approvals and infrastructure, and investor contributions.   While only the estimate of Plan obligations is disclosed, it is obvious that the proposed investors' contributions, which are merely voluntary and not legally committed, are insufficient.  Given that the approvals are uncertain, the remaining funding source, to wit, sale of lots, is not presently available.  Further, the financial wherewithal of the investors has not been disclosed.  Lastly, the existing guarantees are limited in nature.

For the foregoing reasons, the Greene Family submits that the Plan is not feasible. By contrast, the Debtor has already demonstrated substantial funding capabilities by its investors.

      **B.**      **Best Interests Of Creditors Test.**  The Plan must also be in the ӧbest interests of creditorsӧ.  This is a legal term of art which requires that the Plan provides a dividend to the class of creditors that vote against the Plan, which is equal to or greater than the distribution those creditors would realistically receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.  Since the Debtor is paying all claims 100% of their respective allowed amounts over time, this requirement is also met. The Greene Family submits, and the Debtor disputes, that because creditors are being paid over time, the Debtor has failed to demonstrate satisfaction of the best interests of creditors test.

      Moreover, the Plan can still be confirmed even if, as expected, the Greene Family does not vote favorably on the Plan, through the ӧcramdownӧ provisions of Section 1129(b) of the Bankruptcy Code.  This familiar section of the Bankruptcy Code permits confirmation if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by ӧinsidersӧ (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan ӧdoes not discriminate unfairlyӧ and is ӧfair and equitableӧ with respect to such non-accepting Class.

      The Debtor anticipates that both the Class 3 security deposit creditors and the Class 4 general unsecured creditors will vote in favor of the Plan, providing the necessary accepting class for ӧcramdownӧ purposes, even if the Greene Family votes against the Plan.  For

32

the reasons previously set forth, the Greene Family submits, and the Debtor disputes, that Classes 3 and 4 cannot or will not be available to satisfy the one impaired accepting class requirement of Section 1129(a)(10).

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests.

The Plan provides that the Class 1 Secured Claim of the Greene Family as finally allowed will be paid in full based upon the amount fixed by the Court. Therefore, the Plan does not discriminate unfairly with respect to the Greene Family.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule."  Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims or Interests that has not accepted the Plan must be paid in full if a more junior class receives or retains anything under the Plan.  However, one of the exceptions to the absolute priority rule is when equity holders have contributed new value.  Here, the absolute priority rule would not be violated because of the significant New Value Contributions that have been and will continue to be made by the investors. The Greene Family submits, and the Debtor disputes, that the absolute priority rule will not be satisfied because the United States Supreme Court has yet to decide whether the new value exception applies under the Bankruptcy Code but has stated that if it does, equity of the Debtor must be offered to the market which the Plan does not do.  In addition, the

33

Plan is not fair and equitable in its treatment of the Greene Family secured claim because it contains a release price provision which was not included in the pre-petition loan documents.

It is expected that the parties will brief these issues and ask the Court to resolve them as part of the contested Confirmation Hearing.

## LIQUIDATION ANALYSIS

As part of the confirmation process, the Debtor is required to provide a liquidation analysis to show that creditors stand to receive more than they can reasonably expect in a Chapter 7 case.  The liquidation analysis in this case must focus on the value of the Lake Anne Property. As presently situated, the Lake Anne Property has not yet reached its potential, and has a current fair market value of $6.7 million without approvals in place.   Thus, in liquidation, unsecured creditors cannot reasonably expect to receive any distribution, and even the secured claim of the Greene Family would likely not be paid in full.   A copy of the Debtor's liquidation analysis is annexed hereto as <u>Exhibit</u> ōHö.   The Greene Family submits, and the Debtor disputes, that the value of the Lake Anne Property is in excess of all debt entitling all creditors to post-petition interest.     Thus, this liquidation analysis does not satisfy the requirements of Section 1129(a)(7)(A)(ii).

## CONCLUSION

The Debtor believes the Plan should be confirmed even over the possible objection of the Greene Family.

Dated: New York, New York
        February 29, 2016

Keen Equities LLC                      Goldberg Weprin Finkel Goldstein LLP
                                       Attorneys for the Debtor

34

1501 Broadway, 21st Floor
New York, NY 10036

By:    Y.C. Rubin                    By:    /s/ Kevin J. Nash, Esq.
          Manager

X:\GWFG\New Data\Yen\Word\Keen Equities LLC- YC Rubin (#Rubyc.33297)\Disclosure Statement (Third Amended And Revised) 02-26-16.Doc